## IN THIS UNITED STATES DISTRICT COURT FOR THE
## NORTHERN DISTRICT OF ILLINOIS, EASTERN DIVISION

| | | |
|---|---|---|
| **ANNA B. ISBELL,** | } | |
| | } | |
| **Plaintiff,** | } | **Civil Action** |
| | } | |
| **v.** | } | **Case No.  11 cv 02347** |
| | } | |
| **JOHN CRANE, INC.,** | } | **Judge Milton I. Shadur** |
| | } | |
| | } | |
| **Defendant.** | } | |

### PLAINTIFF ANNA B. ISBELL'S RESPONSE TO JOHN CRANE, INC.'S STATEMENT OF UNDISPUTED MATERIAL FACTS IN SUPPORT OF ITS MOTION FOR SUMMARY JUDGMENT AND ADDITIONAL STATEMENT OF UNDISPUTED MATERIAL FACTS IN OPPOSITION TO DEFENDANT'S MOTION FOR SUMMARY JUDGMENT

Pursuant to Fed. R. Civ. P. 56 and District of Illinois Local Rules 56.1(a), Plaintiff Anna B. Isbell ("ISBELL"), by and through counsel, POKORNY & MARKS, LLC, hereby submits her Response to John Crane, Inc.'s ("JCI") Statement of Undisputed Material Facts in Support of its Motion for Summary Judgment and Additional Statement of Facts in Opposition to Defendant's Motion of Summary Judgment ("RDSSOF").

ISBELL incorporates by reference, as if fully stated herein, her Separate Statement of Facts in Support of their Motion for Partial Summary Judgment ("SSOF") (Dkt.# 52), ISBELL's objections as stated and applied by the Court on September 10, 2013 in her Motion to Strike Certain Facts Contained in Defendant John Crane, Inc.'s ("JCI") Local Rule 56.1 Statement of Undisputed Material Facts in Support of its Motion for Summary Judgment ("Motion to Strike") (Dkt.#s 65 and 62), as well as the Court's entire record in this matter.

### The Parties, Pertinent Employees, Claims, Jurisdiction, And Venue

1.      JCI, a corporation with its manufacturing headquarters located in Morton Grove Illinois, is in the business of manufacturing, selling, and servicing engineered sealing systems for a wide range of global industrial markets and industries such as oil and gas, chemical, mining and minerals, water systems, refrigeration compression, pharmaceutical, food and beverage, pulp and paper, and power generation. (Declaration of James Wasser ("Wasser Decl.") ¶4; Wasser's declaration is attached as Tab A). JCI's service to the oil and gas industry is a key segment of its business in that its design, development, and manufacturing of mechanical seals and sealing support systems is critical to the smooth and continuous operations of those customers.  (Wasser Decl. ¶5).

**ANSWER**:    For the purposes of John Crane, Inc.'s ("JCI") Motion for Summary Judgment only, ISBELL admits the facts alleged by JCI in its Local Rule 56.1 Statement of Undisputed Material Facts in Support of its Motion for Summary Judgment ("DSSOF") No. 1.

2.      Plaintiff Anna B. Isbell ("Isbell") was employed by JCI as a Chemical Engineer I from April 2003, until August 26, 2009, when she was terminated for continued attendance violations after previously being issued a Final Warning. (Anna B. Isbell Deposition ("Isbell Dep.") p. 89; Isbell Deposition Exhibit ("Isbell Dep. Ex.") 53. Isbell's deposition transcript is attached as Tab B.1.  Exhibits utilized in Isbell's deposition are attached as Tab B.2)

**ANSWER**:    For the purposes of JCI's Motion for Summary Judgment only, ISBELL admits the facts alleged by JCI in its DSSOF No. 2.

3.      James Wasser ("Wasser") is JCI's Global Director of New Product Development, Materials and Test Laboratories and has been employed in this capacity since 2008, which was during the relevant time period applicable to the claims asserted in this lawsuit. (James Wasser Deposition ("Wasser Dep.") p. 14; Wasser's deposition transcript is attached as Tab C.1). Wasser

supervises approximately 30 employees and his job responsibilities include managing product development and the test laboratories on a global basis. (Wasser Dep. p. 15). Wasser was not Isbell's direct supervisor; however, he managed her department. (Wasser Dep. pp. 19-20).

**ANSWER**: Objection, irrelevant and immaterial.  JCI does not cite this particular "fact" anywhere in its Memorandum in support of its Motion for Summary Judgment ("Memorandum").  Further, the number of employees Wasser supervises as well as his job responsibilities are not material to the outcome of this case – he was not ISBELL's direct supervisor.  Without waiving said objection, for the purposes of JCI's Motion for Summary Judgment only, ISBELL admits the facts alleged by JCI in its DSSOF No. 3.

4.    James Derby ("Derby") is JCI's Laboratory Manager in the Materials Laboratory and has been employed in this capacity since September 2006, which was during the relevant time period applicable to the claims asserted in this lawsuit. (James Derby Deposition ("Derby Dep.") pp. 22, 25; Derby's deposition transcript is attached as Tab D). Derby was Isbell's direct supervisor from September 2006, through August 2009 and also supervised a metallurgical engineer, analytical chemist, and mechanical technician. (Derby Dep. p. 25). Wasser was Derby's supervisor from September 2008, until 2011.  (Derby Dep. p. 28). From September 2006, through August 2009, while not performing his supervisory duties, Derby's core technology function pertained to physics and ceramic science. Specifically, Derby allocated his time to the areas of fractography and tribology, with focus on ceramic materials such as silicon and tungsten carbide, carbon graphite, and diamonds. (Derby Dep. p. 74). Approximately 40% of Derby's time is spent at JCI's facility located in Crystal Lake, Illinois. (Derby Dep. p. 23).

**ANSWER**:    Objection, irrelevant and immaterial.   JCI fails to reference Derby's general job duties in its Memorandum and further his general job duties are not in any way material to the outcome of this case.  Without waiving said objection, for the purposes of JCI's Motion for Summary Judgment only, ISBELL admits the facts alleged by JCI in its DSSOF No. 4.

5.    Walter Burdorf ("Burdorf") held several Human Resources positions with JCI from 1978, until November 2012, and his last title was Human Resources Director, which was during the relevant time period applicable to the claims asserted in this lawsuit. As the Human Resources Director, Burdorf supervised the Human Resources Generalists, Leave Administrator, and H.R.S. Technician, and his overall responsibilities included the United States and Canada. (Walter Burdorf Deposition ("Burdorf Dep.") pp. 10, 19; Burdorf's deposition transcript is attached as Tab E).

**ANSWER**:    For the purposes of JCI's Motion for Summary Judgment only, ISBELL admits the facts alleged by JCI in its DSSOF No. 5.

6.    Antonio Caballero ("Caballero") held multiple Human Resources positions with JCI from July 2007, until 2012, when his job was eliminated as part of a restructuring of the Human Resources Department. Caballero was a Human Resources Generalist from July 2007, through May 2010, which was during the relevant time period applicable to the claims asserted in this lawsuit. (Tony Caballero Deposition ("Caballero Dep.") pp. 21-23; Caballero's deposition transcript is attached as Tab F). Caballero's job responsibilities as a Human Resources Generalist included talent acquisition, employee relations, and compensation. (Caballero Dep. pp. 21-22). In May 2010, Caballero was promoted to the position of Human Resources Manager, which required more responsibilities. (Caballero Dep. p. 22). Caballero was Isbell's

primary Human Resources contact from October 2008 through August 26, 2009. (Isbell Dep. pp. 273-274).

**ANSWER**:    For the purposes of JCI's Motion for Summary Judgment only, ISBELL admits the facts alleged by JCI in its DSSOF No. 6.

7.    Jan Tuton ("Tuton") is JCI's Leave Administrator and has been employed in this capacity since March 2005, which was during the relevant time period applicable to the claims asserted in this lawsuit.   (Jan Tuton Deposition ("Tuton Dep.") p. 22; Tuton's deposition transcript is attached as Tab G). Tuton's job responsibilities include processing requests pursuant to FMLA, short-term disability, long-term disability, and requests for reasonable accommodation under the Americans with Disabilities Act ("ADA"). (Tuton Dep. pp. 22-23).

**ANSWER**:    For the purposes of JCI's Motion for Summary Judgment only, ISBELL admits the facts alleged by JCI in its DSSOF No. 7.

8.    Ron Kleck ("Kleck") is a Metallurgical Engineer I in JCI's Materials Laboratory and has been employed in this capacity for about 30 years, which was during the relevant time period applicable to the claims asserted in this lawsuit. (Derby Dep. pp. 53-55).

**ANSWER**:    For the purposes of JCI's Motion for Summary Judgment only, ISBELL admits the facts alleged by JCI in its DSSOF No. 8.

9.    Ruby Longoria ("Longoria") was employed by JCI from 1969, until 2009, when she retired after 40 years of service. For the last 20-25 years of her employment, Longoria was a Supervisor in the Inspection Department, which was during the relevant time period applicable to the claims asserted in this lawsuit. Longoria's job responsibilities included making sure the materials that JCI purchased from its suppliers met industry standards so that they could

be used to manufacture seals and other products by JCI. (Declaration of Ruby Longoria ("Longoria Decl.") ¶¶2-3; Longoria's declaration is attached as Tab H).

**ANSWER**: For the purposes of JCI's Motion for Summary Judgment only, ISBELL admits the facts alleged by JCI in its DSSOF No. 9.

10.     Nancy Liewehr ("Liewehr") is JCI's Nuclear Seal Operations Supervisor and has been employed in this capacity for the last 23 years, which was during the relevant time period applicable to the claims asserted in this lawsuit. The Nuclear Department manufactures unique mechanical seals for nuclear power plants, as well as nuclear submarines as specified by JCI's contracts with the United States Navy. Liewehr's duties include providing customers with price quotes and making sure that products are shipped to customers on a timely basis. Liewehr has a long history of working with nuclear plants. (Declaration of Nancy Liewehr ("Liewehr Decl.") ¶¶2-4; Liewehr's declaration is attached as Tab I).

**ANSWER**: For the purposes of JCI's Motion for Summary Judgment only, ISBELL admits the facts alleged by JCI in its DSSOF No. 10.

11.     Colleen Singer ("Singer")[1] is JCI's Customer Service Supervisor and has been employed in this capacity since 2007, which was during the relevant time period applicable to the claims asserted in this lawsuit.  The Customer Service Department works with JCI's customers to ensure they receive products on a timely basis.  Singer's job duties include overseeing the daily activities of approximately 10 employees, and generating on-time delivery reports. On-time delivery reports are a metric used by JCI to gage its track record of meeting the requirements of its customers. (Declaration of Colleen Singer ("Singer Decl.") ¶¶2-3; Singer's declaration is attached as Tab J).

---

[1] Ms. Singer's last name when she worked with Isbell was Czyznik. She has since married and changed her last name.

**ANSWER**: For the purposes of JCI's Motion for Summary Judgment only, ISBELL admits the facts alleged by JCI in its DSSOF No. 11.

12. Kaneez Shoukathullah ("Shoukathullah") is JCI's Special Project Contract Specialist in the Customer Service Department and has been employed by JCI since July 2006, which was during the relevant time period applicable to the claims asserted in this lawsuit. Shoukathullah's job duties include working on high dollar and high visibility projects. (Declaration of Kaneez Shoukathullah ("Shoukathullah Decl.") ¶¶2-3; Shoukathullah's declaration is attached hereto as Tab K). Shoukathullah was Isbell's primary contact in the Customer Service Department. (Isbell Dep. p. 152).

**ANSWER**: For the purposes of JCI's Motion for Summary Judgment only, ISBELL admits the facts alleged by JCI in its DSSOF No. 12.

13. Isbell filed a Charge of Discrimination with the Equal Employment Opportunity Commission ("EEOC") and Illinois Department of Human Rights ("IDHR") on or about April 15, 2009, alleging a failure to accommodate under the ADA and sex discrimination under Title VII. (Plaintiff's Charge of Discrimination dated April 15, 2009 ("April 15, 2009 Charge"), attached as Tab L).

**ANSWER**: For the purposes of JCI's Motion for Summary Judgment only, ISBELL admits the facts alleged by JCI in its DSSOF No. 13.

14. Isbell filed a Charge of Discrimination with the EEOC and IDHR on or about July 14, 2009, alleging discrimination under the ADA and retaliation under the ADA and Title VII. (Plaintiff's Charge of Discrimination dated July 14, 2009 ("July 14, 2009 Charge"), attached as Tab M).[2]

---

[2] Though Isbell's Complaint allegations state that the one of the causes of action resulting from the July 14, 2009 Charge is a failure to accommodate under the ADA, the Charge does not allege a failure to accommodate..

**ANSWER**:    For the purposes of JCI's Motion for Summary Judgment only, ISBELL admits the facts alleged by JCI in its DSSOF No. 14.

15.    Isbell filed a Charge of Discrimination with the EEOC and IDHR, which was perfected on August 20, 2010, alleging a failure to accommodate under the ADA and retaliation under the ADA and Title VII. (Plaintiff's Charge of Discrimination dated August 20, 2010 ("August 20, 2010 Charge"), attached as Tab N).

**ANSWER**:    For the purposes of JCI's Motion for Summary Judgment only, ISBELL admits the facts alleged by JCI in its DSSOF No. 15.

16.    The Court has subject matter jurisdiction over Isbell's federal and state claims pursuant to 28 U.S.C. §§ 1331 and 1367, respectively. (Answer to Plaintiff's Complaint ("Ans.") ¶ 8, attached as Tab O).[3] Venue is proper in the United States District Court for the Northern District of Illinois pursuant to 28 U.S.C. § 1391(b). (Ans. ¶ 9).

**ANSWER**:    For the purposes of JCI's Motion for Summary Judgment only, ISBELL admits the facts alleged by JCI in its DSSOF No. 16.

### JCI's Employee Handbook And Pertinent Policies, Including The Attendance/Tardiness Policy And Technology Attendance Guidelines

17.    At all relevant times, JCI had in place an Employee Handbook ("Handbook"). The purpose of the Handbook is to inform employees of the rules, regulations, and policies governing their employment with JCI. (Burdorf Dep. p. 24). The version of the Handbook applicable to the claims asserted in this lawsuit was drafted in 2003 and was not updated until 2010, after Isbell's last date of employment. (Burdorf Dep. pp. 25-26). The Handbook addresses a wide range of topics that include quality assurance, equal employment opportunity, work place harassment, drug and alcohol, compensation, timekeeping, safety,

---

[3] Though not pleaded in the Complaint, and therefore not referenced in the Answer, the Court also has jurisdiction pursuant to 28 U.S.C. § 1331.

general workplace rules, employee benefits, and the employee assistance program. (Burdorf Dep. p. 24). Isbell signed a statement on April 7, 2003, acknowledging her receipt and understanding of the policies contained in the Handbook. (Isbell Dep. p. 90; Isbell Dep. Ex. 5).

**ANSWER**:    Objection, irrelevant and immaterial.   The fact that JCI maintained a Handbook during the relevant time period may be material; however, in addition to JCI's failure to cite this "fact" in its Memorandum, the Handbook referenced is an updated version <u>after</u> ISBELL's termination, and is therefore irrelevant and not material to the outcome of this case. Without waiving said objection, for the purposes of JCI's Motion for Summary Judgment only, ISBELL admits the facts alleged by JCI in its DSSOF No. 17.

18.    The Handbook contains a statement from JCI's President underscoring JCI's commitment to being an equal opportunity employer, which states in part that:

> The Company believes that all persons are entitled to equal opportunity and that employees and applicants for employment should receive fair and equal treatment regardless of race, color, religion, national origin, ancestry, gender, sexual orientation, age, disability, veteran status or marital status.   There will be no discrimination in matters, including but not limited to promotions, demotions, transfers, layoffs, terminations, compensation and selection for training or selected programs. Denial of these rights to any applicant or employee, or harassment of any employee because he/she is a member of one of these groups will not be tolerated.   Such conduct will result in appropriate disciplinary action, up to and including discharge.

(Isbell Dep. Ex. 6).

**ANSWER**: Objection, irrelevant and immaterial.  JCI fails to cite DSSOF paragraph 18 in its Memorandum and JCI conveniently neglects to establish foundation for Exhibit 6 specifically omitting any deposition testimony referencing said Exhibit.   As such, DSSOF paragraph 18 is not a fact in the record and thus, improper and must be stricken.   Without

waiving said objection, for the purposes of JCI's Motion for Summary Judgment only, ISBELL

admits the facts alleged by JCI in its DSSOF No. 18.

19.     The Handbook contains a statement from JCI's President underscoring JCI's

commitment to complying with the ADA, which states in part that

> The Company believes that all persons are entitled to equal
> opportunity and that employees and qualified applicants for
> employment should receive fair and equal treatment regardless of
> any disability. There will be no discrimination in matters,
> including but not limited to, promotions, demotions, transfers,
> layoffs, terminations, compensation and selection for training or
> other programs. Denial of these rights to any applicant or
> employee, or harassment of any employee with a disability will
> not be tolerated. Such conduct will result in appropriate
> disciplinary action, up to and including discharge.

> Any employee who believes that he/she has been discriminated
> against based on his/her disability should immediately report
> such conduct to his/her respective Human Resources Advisor
> (please see appendix for listing on page 115). The responsible
> Human Resources Advisor will investigate the complaint, report
> findings and present a recommendation for action to the Vice
> President Human Resources within five (5*) working days of the
> incident or notice thereof.

> We trust that all employees of the Company will continue to
> act responsibly and work with management to maintain a pleasant
> and effective working environment, free of all forms of
> discrimination.

> Questions concerning this policy should be directed to your
> respective Human Resources Advisor or the Vice President
> Human Resources.

(Isbell Dep. Ex. 7).

     **ANSWER**: Objection, irrelevant and immaterial. JCI fails to cite DSSOF paragraph 19

in its Memorandum and JCI conveniently neglects to establish foundation for Exhibit 7

specifically omitting any deposition testimony referencing said Exhibit. As such, DSSOF

paragraph 19 is not a fact in the record and thus, improper and must be stricken. Without

waiving said objection, for the purposes of JCI's Motion for Summary Judgment only, ISBELL

admits the facts alleged by JCI in its DSSOF No. 19.

20.     The Handbook contains JCI's Progressive Discipline Rules, which state in

part that:

> It is the policy of the Company to generally utilize progressive disciplinary measures for employees who violate various company policies or rules.  This means for many disciplinary matters, discipline will ordinarily follow a three-step procedure. Discipline will generally start with a written warning placed in the employee's personnel file as the first step and proceed in a progressively more serious manner, up to and including discharge.  Accelerated discipline, wherein one or more of the disciplinary steps are bypassed, may be implemented in cases of serious violations of company policies or rules. The Company, however, reserves the exclusive right to initiate any disciplinary action, at any step, in its own discretion.

> *****

> Company rules are established to promote the safety and welfare of all employees and protect the interests of the Company and its employees. Employees are to use good judgment at all times.

> The steps for progressive discipline
> are:

> **<u>Written Warning</u>**

>> The purpose of the written warning is to assist the employee in correcting the existing problem(s) and to provide a written record of a discussion and what is the corrective action needed.

> **<u>Final Warning</u>**

>> The final warning represents the last level of discipline in the progressive discipline system prior to discharge. It is utilized so that there can be no misunderstanding on the part of the employee with respect to what has been discussed and what the required corrective action must be.

**Discharge**

> The final step in the disciplinary process where the
> employee is terminated for cause.

(Isbell Dep. Ex. 13).

**ANSWER**: Objection, irrelevant and immaterial. JCI fails to cite DSSOF paragraph 20 in its Memorandum and JCI conveniently neglects to establish foundation for Exhibit 13 specifically omitting any deposition testimony referencing said Exhibit. As such, SSOF paragraph 20 is not a fact in the record and thus, improper and must be stricken. Without waiving said objection, for the purposes of JCI's Motion for Summary Judgment only, ISBELL admits the facts alleged by JCI in its DSSOF No. 20.

21. The Handbook contains JCI's Attendance/Tardiness Policy, a no-fault policy that assigns points to employees who miss work, are tardy, or leave early without the existence of exceptional circumstances. The Attendance/Tardiness Policy states in part that.

**ANSWER**: For the purposes of JCI's Motion for Summary Judgment only, ISBELL admits the facts alleged by JCI in its DSSOF No. 21.

22. Though the Attendance/Tardiness Policy states that "[a]ttendance and punctuality are important for meeting the needs of the Company customers and for the success of every employee at the Company," at her deposition Isbell testified as follows with regard to the importance of being punctual on the job: "I do not consider it to be of exceeding importance." (Isbell. Dep. p. 118; Isbell Dep. Ex. 14).

**ANSWER**: Objection, irrelevant and immaterial. JCI fails to cite DSSOF paragraph 22 in its Memorandum. In addition, the fact that JCI maintains an attendance policy may be material; however, ISBELL's statement in her deposition that she does not consider the attendance policy to "be of *exceeding* importance" is not material. The fact is, JCI's attendance

policy says what it says and ISBELL's opinion about that policy lends no value to its application and the outcome of this case. Without waiving said objection, for the purposes of JCI's Motion for Summary Judgment only, ISBELL admits the facts alleged by JCI in its DSSOF No. 22.

23. At all relevant times, JCI had in place Technology Attendance Guidelines, which state in part that:

> Tardiness and Leaving Work Early
> There is a 30-minute grace period, which means if you report to work within 30 minutes of your regularly scheduled starting time, and you make up this time within the same workweek, you are not considered in violation of the Company's Attendance Policy.
>
> If you have personal circumstances that require you to report to work late or leave work early, you should discuss the situation with your Manager in advance.
>
> Unless there are extenuating circumstances, if you report to work more than 30 minutes after your regularly scheduled starting time, or you leave work early without prior approval and acknowledgment, this will be counted per the Company's Attendance Policy.
>
> If an employee needs to take personal time, up to two hours may be taken at the beginning or end of the day. This time must be made up within the workweek, and must be pre-approved by the supervisor.
>
> Reviewing and Monitoring
> Managers / Supervisors are responsible for monitoring their employees' attendance and for counseling and issuing discipline for attendance where appropriate.
>
> This policy will be reviewed on an annual basis.
>
> (Isbell Dep. Ex. 15).

**ANSWER**: For the purposes of JCI's Motion for summary Judgment only, ISBELL admits the facts alleged by JCI in its DSSOF No. 23.

24.     The Technology Attendance Guidelines are not intended to apply on an every day basis; rather, those guidelines apply when a unique situation occurs causing an employee to be late for work. The employee is supposed to contact their supervisor and inform him/her that he/she will be late. In such an instance, as long as the employee is not more than 30 minutes late for work, they will not be assessed a point under the Attendance/Tardiness Policy if they make up the work missed in the same week. (Derby Dep. p. 70; Isbell Dep. p. 127). The Technology Attendance Guidelines applied to everyone in the Engineering Department. (Caballero Dep. p.103). Isbell admits the 30 minute grace period applied to her while she was employed by JCI. (Isbell Dep. p. 127).   In fact, nobody at JCI told Isbell that the Technology Attendance Guidelines did not apply to her. (Isbell Dep. p. 129).

**ANSWER**: Objection, argumentative.  DSSOF paragraph 24 (sentence 1) is self-serving argument and is completely contradicted by actual "facts" referenced in JCI's DSSOF.  Nowhere in the JCI Attendance Policy or JCI Technology Attendance Guidelines does it state JCI's self-serving assertion that the 30-minute grace period is to be applied only when a "unique situation occurs."   In fact, Wasser and Caballero both testified that the 30 minute grace period does not have a use limit and an employee is not prevented from using it as frequently as he or she needs.[4] Notwithstanding said objection, for the purposes of JCI's Motion for Summary Judgment only, ISBELL disputes DSSOF No. 24 (sentence 1) and admits the remaining facts alleged by JCI in its DSSOF No. 24.

### JCI's Training Of Its Supervisors With Regard To The Handbook, Dealing With Employee Issues, Including Attendance, And Requests For Reasonable Accommodation Under The ADA

25.     JCI's supervisors and managers are counseled and coached by Human Resources on how to implement the policies and procedures detailed in the Handbook. (Burdorf Dep. pp.

---

[4] See Dkt.# 52, at ¶12.

27-28). Supervisors and managers are not trained in a classroom setting; however, they receive necessary guidance from Human Resources when issues arise. (Caballero Dep. p. 48). Derby received training to ensure he is equipped to follow the policies in the Handbook and treats all employees equally. (Caballero Dep. p. 44).

**ANSWER**:    Objection, mischaracterizes testimony.  Derby admitted that he was not familiar with the Americans with Disabilities Act and Title VII of the Civil Rights Act of 1964 or with the acts' statutory enforcement procedures.[5]  He further admits that he did not receive any training on enforcing the ADA and Title VII in the workplace.[6]  Without waiving said objection, for purposes of JCI's Motion for Summary Judgment only, based on the testimony referenced, ISBELL disputes DSSOF No. 25 (sentence 3) and admits the remaining facts alleged by JCI in its DSSOF No. 25.

26.    Supervisors and managers are not required to involve Human Resources in routine employee attendance issues. (Burdorf Dep. p. 35). Attendance is monitored by the supervisors and managers. (Burdorf Dep. p. 74). When an employee's attendance issues are not amenable to remediation, Human Resources is made aware of the problem and works proactively with the supervisor, manager, and/or employee to resolve the issue. (Caballero Dep. p. 29). A supervisor or manager is free to implement a localized policy unique to a particular department as long as that policy does not contradict the Handbook. (Caballero Dep. p. 40). For example, supervisors and managers have discretion with regard to the start time of employees within their department. (Caballero Dep. p. 42).

**ANSWER**:    For the purposes of JCI's Motion for Summary Judgment only, ISBELL admits the facts alleged by JCI in its DSSOF No. 26.

---

[5] See Dkt.# 52, at ¶50.
[6] See Dkt.# 52, at ¶50.

27.     A request for a reasonable accommodation can be made to a supervisor or to Tuton. (Caballero Dep. p. 55; Tuton Dep. p. 38).   Whenever a request for a reasonable accommodation is made under the ADA, Tuton seeks the involvement of the Human Resources advisor assigned to the particular employee's area. (Tuton Dep. p. 38).   A request for a reasonable accommodation under the ADA can be initiated as a verbal request, but must always be submitted in writing to substantiate that request.   (Caballero Dep. p. 55).   Supervisors understand that a reasonable accommodation request under the ADA should be forwarded to Human Resources or Tuton. (Caballero Dep. 57; Tuton Dep. p. 45). Tuton handles the medical documentation pertaining to requests for a reasonable accommodation. (Tuton Dep. p. 45; Caballero Dep. pp. 59-60).   Though Tuton receives the documentation and processes the requests, she does not make decisions regarding any requests. (Tuton Dep. p. 45).

**ANSWER**:     ISBELL disputes that a request for a reasonable accommodation under the ADA must be submitted in writing to "substantiate" that request.   JCI does not have a written policy regarding reasonable accommodation requests pursuant to the ADA and nowhere in the employee handbook does it require an employee submit a <u>written</u> request for a reasonable accommodation.[7]   For the purposes of JCI's Motion for Summary Judgment only, ISBELL admits the remaining facts alleged by JCI in its DSSOF No. 27.

28.     When necessary, JCI requests the employee's physician to answer questions that are critical to determining whether a reasonable accommodation can be made and the nature of the condition that requires an accommodation.   (Caballero Dep. p. 65).   Supervisors and managers do not typically review the medical information submitted by the employee's physician. (Caballero Dep. p. 67; Derby Dep. p. 90). Human Resources discusses reasonable

---

[7] See Deposition of Walt Burdorf, at pg. 37, lines 13-16, true and correct copies of relevant portions which are attached hereto and incorporated herein by reference as Exhibit 1.

accommodation requests with supervisors and managers to determine if a request is reasonable under the facts and circumstances. (Caballero Dep. p. 66). If an accommodation request is reasonable, JCI moves forward and implements it; if not, JCI holds further discussions with the employee to identify other options to satisfy the request. (Caballero Dep. pp. 67, 69-70).

**ANSWER**:    For the purposes of JCI's Motion for Summary Judgment only, ISBELL admits the facts alleged by JCI in its DSSOF No. 28 as it relates to general accommodation requests <u>only</u> and not ISBELL's specific requests pursuant to the ADA.

29.    An employee who makes an accommodation request is consulted prior to JCI's decision regarding that request. (Caballero Dep. p. 69). Human Resources is always responsible for issuing a determination with regard to ADA requests. (Caballero Dep. pp. 99-100).

**ANSWER**:    For the purposes of JCI's Motion for Summary Judgment only, ISBELL admits the facts alleged by JCI in its DSSOF No. 29 as it relates to general accommodation requests only but denies that she was adequately consulted prior to JCI's decision regarding her requests for a reasonable accommodation pursuant to the ADA.

### Isbell's Job Duties As A Chemical Engineer I

30.    Isbell's title throughout her entire employment with JCI was Chemical Engineer I. (Isbell Dep. p. 134). Isbell was the only Chemical Engineer I while she held employment with JCI. (Isbell Dep. p. 135). At all relevant times, there was a job description summarizing the duties of the Chemical Engineer I. Isbell has no evidence that the job description did not apply to her duties. (Isbell Dep. p. 135; Isbell Dep. Ex. 16). The Chemical Engineer I job description states as follows:

BASIC FUNCTION:

Under indirect supervision and direct supervision on new aspects of assignments, plan and conduct analytical research and

development work involving chemical and metallurgical analysis and investigation to determine quality of materials used in existing products and in the development of new and improved products.

PRIMARY DUTIES:

- Analyze field failures and competitor products to assist in development of improved products.

- Conduct conformance testing on materials received from vendors for quality assurance.

- Provide technical services for interdepartmental personnel, field engineers, and customers.

- Maintain contact with vendors and assist with technical standards.

- Follow work plans, maintain appropriate records, and provide written reports.

- Provide testing to support material quality assurance.

MINIMUM REQUIREMENTS FOR ENTRY:
A Bachelor of Science Degree in Chemistry or Chemical Engineering or equivalent with one to two years of related laboratory experience and analytical procedures is required. Must possess a fundamental theoretical and working knowledge of laboratory equipment and analytical instrumentation and the appropriate computer skills.

(Isbell Dep. Ex. 16).

**ANSWER**:    For the purposes of JCI's Motion for Summary Judgment only, ISBELL admits the facts alleged by JCI in its DSSOF No. 30.

31.    Isbell agrees that all of the job duties listed on the Chemical Engineer I job description were job duties she had while employed by JCI. (Isbell Dep. pp. 144-145). When asked during her deposition to identify any job duties that were not listed on her job description, Isbell added one more duty as follows: "I coordinated many incoming tests and did various kinds of chemical remediation." (Isbell Dep. p. 145). When asked if that is a complete list of the

additional duties she performed as a Chemical Engineer I, Isbell testified as follows: "I do not believe so, but I cannot come up with any others at this time." (Isbell Dep. p. 146).

**ANSWER**:   For the purposes of JCI's Motion for Summary Judgment only, ISBELL admits the facts alleged by JCI in its DSSOF No. 31; however, ISBELL also was required to perform many job duties outside her job description which she did perform adequately.[8]

32.   A Chemical Engineer I is responsible for checking products before they are shipped to ensure they are in accordance with industry standards. That process is known as a positive material identification. Products cannot be shipped to customers until the positive material identification is performed. (Wasser Dep. p. 28). In addition, a Chemical Engineer I is responsible for answering questions that are generated by internal customers who are employees in other departments at JCI, such as materials or chemical related questions. (Wasser Dep. pp. 27-28).  The following departments at JCI have employees who were internal customers to Isbell: Customer Service, Nuclear, Shipping and Receiving, Regional Engineering, Application Engineering, and Inspection. (JCI's Answers and Objections to Plaintiff's First Set of Interrogatories No. 23, attached as Tab P).

**ANSWER**:   For the purposes of JCI's Motion for Summary Judgment only, ISBELL admits the facts alleged by JCI in its DSSOF No. 32.

33.   Isbell's technology function as a Chemical Engineer I was to primarily deal with elastomer materials and any materials that required a material conformance test or positive material identification. (Derby Dep. pp. 57-58, 73). A technology function is related to an employee's specific technical training. (Derby Dep. p. 73).

**ANSWER**:   For the purposes of JCI's Motion for Summary Judgment only, ISBELL admits the facts alleged by JCI in its DSSOF No. 33.  Further answering, Derby, as ISBELL's

---

[8] See Dkt.#52, at ¶¶9, 10.

supervisor, had the authority and discretion to change ISBELL's day-to-day activities, which included positive material identification.[9]

34.     Isbell's responsibilities were principally related to providing service to JCI's internal customers. (Derby Dep. p. 55). Isbell's main responsibility was to perform material conformance tests and positive material identifications. (Derby Dep. p. 57-58). Isbell admitted at her deposition that providing services to internal customers was an important part of her job. (Isbell Dep. p. 148).

**ANSWER**:     For the purposes of JCI's Motion for Summary Judgment only, ISBELL admits the facts alleged by JCI in its DSSOF No. 34. Further answering, Derby, as ISBELL's supervisor, had the authority and discretion to change ISBELL's day-to-day activities, which included providing service to certain internal customers.[10]

## Ron Kleck's Duties As A Metallurgical Engineer I
## And Differences Between Those Duties And Isbell's Duties As A Chemical Engineer I

35.     In addition to Isbell, Derby also supervised Kleck, a Metallurgical Engineer I in the Materials Laboratory. (Derby Dep. pp. 25, 27). At all relevant times, there was a job description summarizing the duties of the Metallurgical Engineer I. (Isbell Dep. Ex. 17). The Metallurgical Engineer I job description states as follows:

> BASIC FUNCTION:
>
> Under the direction of the Senior Materials Engineer, conduct examinations and experiments relating to the physical and mechanical characteristics, properties and processing of products from metals and ceramics assigned to the Metallurgical Materials group.
>
> PRIMARY DUTIES:
>
> • With assistance, identify and define the purpose of each

---

[9] See Dkt.#52, at ¶9.
[10] See Dkt.#52, at ¶9.

investigation.

- Perform necessary background investigations to select or design appropriate tests or experiments needed to develop data for logical conclusions.

- Organize all necessary related information and reports to appropriate personnel.

- Perform operational functions of the Metallurgical/Materials group that are necessary to provide the services, supplies and equipment for the operation of the Laboratory.

- Provide direction and guidance to Metallurgical technician with respect to on-the-job training and work to promote timely and accurate completion of work and professional development.

- Recommend, develop and implement policies, procedures and standards for the orderly functioning of the group under the direction of the Senior Materials engineer.

- Confer with customers or vendors for the purpose of obtaining information necessary to conduct daily investigations and to select and purchase equipment, material and services.

- Conduct failure analysis of products that have failed in service, manufacturing, testing or transportation.

- Write technical reports in a logical, comprehensive and reader-friendly style.

- Plan and schedule daily and weekly operations of the group in accordance with short and long-range plans and revise as necessary.

- Conduct routine preventative maintenance inspections on all equipment and instrumentation assigned to the Metallurgical/Materials Group.

- Keep abreast of current technological developments within and outside of the company.

MINIMUM REQUIREMENTS FOR ENTRY:

Requires a BS in Metallurgical Engineering or Materials Science and a minimum of two years' experience in Physical Metallurgy and in SEM/EDS (systems) or equivalent related training. Must also be computer literate.

(Isbell Dep. Ex. 17).

**ANSWER**:   Objection, irrelevant and immaterial.  JCI does not cite any portion of SSOF paragraph 35 in its Memorandum.  Moreover, Kleck's general job responsibilities are immaterial to ISBELL's claims as JCI has admitted that Kleck had no role in JCI's decision to accommodate or terminate ISBELL.[11]  Without waiving said objection, for the purposes of JCI's Motion for Summary Judgment only, ISBELL admits the facts alleged by JCI in its DSSOF No. 35.

36.     Kleck's core duties as a Metallurgical Engineer I include stipulating that the correct metals are used in JCI's product lines and performing failure analyses with regard to the metals used by JCI. (Derby Dep. p. 54). Kleck's technology function differed from Isbell's in that he principally provided metallurgical evaluations and recommendations, scanning electron microscope analysis, and metallurgical failure analysis.

**ANSWER**:   Objection, irrelevant and immaterial.  JCI does not cite any portion of DSSOF No. 36 in its Memorandum.  Moreover, Kleck's general job responsibilities are immaterial to ISBELL's claims as JCI has admitted that Kleck had no role in JCI's decision to accommodate or terminate ISBELL.[12]  Without waiving said objection, for the purposes of JCI's Motion for Summary Judgment only, ISBELL admits the facts alleged by JCI in its DSSOF No. 36.

---

[11] See Dkt.#52, at ¶48.
[12] Id.

37.     Kleck's responsibilities did not involve dealing with internal customers nearly as much as Isbell.   (Derby Dep. p. 55).   Though there is a slight overlap between Kleck's metallurgical engineering duties and Isbell's chemical engineering duties, Derby, as a supervisor, would not give a chemical engineer responsibility for metallurgical failure analysis because they do not have a similar background. (Derby Dep. p. 56-57; Wasser Dep. p. 37).

**ANSWER**:     Objection, irrelevant and immaterial.   JCI does not cite any portion of DSSOF No. 37 in its Memorandum.   Moreover, Kleck's general job responsibilities are immaterial to ISBELL's claims as JCI has admitted that Kleck had no role in JCI's decision to accommodate or terminate ISBELL.[13]   Without waiving said objection, for the purposes of JCI's Motion for Summary Judgment only, ISBELL admits the facts alleged by JCI in its DSSOF No. 37.

38.     In order to be hired by JCI as a Metallurgical Engineer I, a candidate must possess a B.S. in Metallurgical Engineering and a minimum of two years experience in Physical Metallurgy and in SEM/EDS (systems) or equivalent training. (Isbell Dep. Ex. 17). In order to be hired by JCI as a Chemical Engineer I, a candidate must possess a B.S. in Chemistry or Chemical Engineering or equivalent with one to two years of related laboratory experience. (Isbell Dep. Ex. 16).

**ANSWER**: Objection, irrelevant and immaterial.  In addition to JCI's failure to cite to DSSOF No. 38 in its Memorandum, the specific degree required for a Metallurgical Engineer versus a Chemical Engineer is immaterial – it does not affect the outcome here, not to mention a theoretical assertion of what each candidate must possess is too attenuated.  It merely serves as an inference as to the specific degrees possessed by ISBELL and Kleck, which is improper.

---

[13] Id.

Without waiving said objection, for the purposes of JCI's Motion for Summary Judgment only, ISBELL admits the facts alleged by JCI in its DSSOF No. 38.

39.     One of the "very big performance issues" that JCI confronts is the ability to ship its products on time. On-time delivery is so critical to JCI's success that it is monitored by the CEO, who has held town hall style meetings addressing the entire company with regard to that issue. (Derby Dep. pp. 48, 66). "On-time" delivery is defined by Derby as the ability to meet the internal customer's schedules so that the products can be shipped to JCI's outside customers. (Derby Dep. p. 65).

**ANSWER**:    For the purposes of JCI's Motion for Summary Judgment only, ISBELL admits the facts alleged by JCI in its DSSOF No. 39.

40.     The parts that needed material performance testing and positive material identification by Isbell usually arrived in the lab by 7:00 a.m. and needed to be "turned around" as quickly as possible. (Derby Dep. pp. 67, 116).

**ANSWER**:    For the purposes of JCI's Motion for Summary Judgment only, ISBELL admits the facts alleged by JCI in its DSSOF No. 40.  Further answering, material performance testing had to be completed with enough time to get the verified part to the loading dock for overnight delivery.   Derby "preferred" if material performance testing was done first thing in the morning, however, there is no time requirement for submission of the testing stated in ISBELL's job description or in any other JCI policy.[14]

41.     One of the biggest components of JCI's business portfolio is the oil and gas industry.  (Caballero Dep. p. 247; Derby Dep. p. 116).  When an oil rig is down or similar process in the oil field is not functioning because of a broken or faulty seal, that oil company could lose hundreds of thousands of dollars within a couple of hours.  Isbell's analyses and

---

[14] See Dkt.#52, at ¶45.

testing of seals and the ability for JCI to ship a seal to an idle oil rig is a matter of urgency.

(Caballero Dep. p. 247).

**ANSWER**:     For the purposes of JCI's Motion for Summary Judgment only, ISBELL admits the facts alleged by JCI in its DSSOF No. 41.

42.     It was (and still is) critical to JCI's business operations that Isbell analyzed and tested parts such as seals early in the morning because the parts also needed to be inspected by JCI's Inspection Department prior to being shipped to the outside customers. Employees in the Inspection Department are not scheduled to work past 2:30 p.m. (Liewehr Decl. ¶5). In addition, after Isbell analyzed and tested the parts, and after JCI's inspectors analyzed and tested the parts, outside inspectors were onsite to perform a final inspection. Isbell's failure to perform her testing duties in the early morning resulted in delays that caused a "domino effect" in that the internal and outside inspectors could not perform their jobs; therefore, the products could not be shipped in a timely manner. (Shoukathullah Decl. ¶¶5-6). In addition, if the outside inspectors had to wait for the parts, JCI's customer could charge the extra cost to JCI. (Shoukathullah Decl. ¶7).

**ANSWER**:     ISBELL disputes the facts alleged by JCI in DSSOF No. 42.  The record reflects that PMI analyses were part of a testing service which, as a whole, took up about 25% of ISBELL's job duties.[15]   PMI analyses take about 30 minutes to complete and had to be completed with enough time to get to the loading dock for the carrier to ship overnight.[16]   Again, Derby testified that the request that PMI analyses be completed at a certain time in the morning was merely a "preferred" time and JCI has not produced any written policy or any job description requiring ISBELL complete any task at a certain time in the day other than after-

---

[15] See Dkt.#52, at ¶44; see also Deposition of Jim Derby, at pg. 196, lines 21-24, pg. 197, lines 1-3, true and correct copies of relevant portions which are attached hereto and incorporated herein by reference as Exhibit 2.
[16] See Dkt.#52at ¶44.

acquired alleged justifications and assertions of hypothetical undue hardships for denying ISBELL her requested and medically verified ADA accommodation for a 10:00 a.m. start time.[17]

43. Isbell was not only responsible for testing parts; she also had to create documentation demonstrating that the parts passed the test. This additional step needed to be completed before the Inspection Department could perform its duties. (Liewehr Decl. ¶6). With regard to the positive material identifications, Isbell had to provide a verification before the parts could be shipped. Everything was on hold until Isbell provided the verification. (Derby Dep. pp. 115-116).

**ANSWER**: For purposes of JCI's Motion for Summary Judgment only, ISBELL admits the facts alleged in DSSOF No. 43. Further answering, verifications on parts could and were completed by individuals other than ISBELL. The record reflects that JCI had previously outsourced some of ISBELL's job duties.[18] The record also reflects that other JCI employees were capable of assisting ISBELL in performing positive material identifications ("PMIs") and did the same. Upon special request, Rohit Thakur assisted ISBELL with conducting PMIs during a time period when ISBELL had over 400 PMIs a month to perform – it is more typical to have about 200 PMIs to perform.[19] And, when ISBELL was out on FMLA in 2008, JCI assigned other employees to complete material conformance tests when ISBELL was out on FMLA, including, inter alia, Joe Dauven, Ron Kleck, and some application engineers.[20]

44. There is significant pressure on JCI to meet and exceed customer expectations due to tight competition in the marketplace. (Liewehr Decl. ¶9). JCI utilizes a metric known as the Key Performance Indicator ("KPI") to track the following: (1) what was promised to the

---

[17] See Dkt.#52, at ¶45.
[18] See Exhibit 2, at pg. 85, lines 6-17.
[19] See Exhibit 2, at pg. 76, lines 20-24, pg. 77 lines 1-24.
[20] See Exhibit 2, at pg. 78, lines 20-24, pg. 79, lines 1-24, pg. 80, line 1.

customer; (2) when was a product shipped to a customer; and (3) when did the product actually arrive at the customer's location. (Liewehr Decl. ¶9). JCI's goal is to achieve a 95% success rate as measured by the KPI. Operations Managers closely monitor the KPI and employee performance evaluations, including the possibility of merit increases in wages, are influenced by the success rate. The KPI reports are posted in approximately three to four locations at JCI, including outside the cafeteria where most employees eat every day. (Liewehr Decl. ¶¶9-10).

 **ANSWER**: For the purposes of JCI's Motion for Summary Judgment only, ISBELL admits the facts alleged by JCI in its DSSOF No. 44.

 45. 20-30% of JCI's customers insist on monetary penalty provisions in their purchase orders if products are not shipped on time. One such customer is ITT Goulds, a pump manufacturing company located in Seneca Falls, New York. (Liewehr Decl. ¶11).

 **ANSWER**: For the purposes of JCI's Motion for Summary Judgment only, ISBELL admits the facts alleged by JCI in its DSSOF No. 45.

### Isbell's Attendance/Performance Issues Prior To 2006 And Performance Reviews/Remedial Documents Evidencing Those Issues

 46. After Isbell was hired in April 2003, her regular work hours were 8:30 a.m. to 5:00 p.m. (Isbell Dep. p. 170). Isbell's first supervisor at JCI was Florian Wisniewski ("Wisniewski"). As her supervisor, Wisniewski completed her annual performance review. (Isbell Dep. p. 170).

 **ANSWER**: For the purposes of JCI's Motion for Summary Judgment only, ISBELL admits the facts alleged by JCI in its DSSOF No. 46.

 47. Isbell's 2004 Performance Review, completed by Wisniewski, covering her first year of employment with JCI, noted as follows: "One area of improvement would be to minimize

the use of the ½ hour starting time grace period." (Isbell Dep. p. 171; Isbell Dep. Ex. 18). Isbell admits that she had a history of utilizing the 30 minute grace period in the first year of her employment with JCI. (Isbell Dep. p. 172). Isbell does not believe there is anything discriminatory about Wisniewski commenting on her punctuality issues during her first year of employment. (Isbell Dep. p. 173). As of the date of the 2004 Performance Review, Isbell had not requested a reasonable accommodation under the ADA. (Isbell Dep. pp. 173-174).

**ANSWER**:   Objection, irrelevant, immaterial and asserts a legal conclusion.   Any reference JCI makes with regard to ISBELL's alleged belief that certain practices engaged in by JCI prior to 2008 were not "discriminatory" are not only irrelevant, they are wholly conclusory. Whether or not conduct is "discriminatory" is a legal conclusion involving the interpretation and/or application of legal principles as applied to ***actual facts***.  Without waiving said objection, for the purposes of JCI's Motion for Summary Judgment only, ISBELL admits the remaining facts alleged by JCI in its DSSOF No. 47.

48.   Isbell lives in Rolling Meadows, Illinois, which is about 13 miles from JCI's manufacturing headquarters in Morton Grove. (Isbell Dep. pp. 174-175). During "traffic hours" Isbell's commute to work was 45-50 minutes. (Isbell Dep. p. 175).

**ANSWER**:   For the purposes of JCI's Motion for Summary Judgment only, ISBELL admits the facts alleged by JCI in its DSSOF No. 48.

49.   On May 5, 2005, Wisniewski issued a counseling document to Isbell detailing various performance issues including, in part:

Areas of Improvement:

A) Time Management

- Maintaining an accurate log of daily work hours, i.e. Time
- In and Time Out.

- Maintaining assigned deadline dates on Projects and/or notifying the supervisor if the project deadline requires revision based on time constraints or other limiting factors.
- Completing equipment and instrument calibration and verification on schedule.

C) Internal Customer Satisfaction

- Re-establish credibility with Internal Customers requiring Laboratory Support, i.e. Material Conformance Testing; Nuclear and PMI

Employee Action

Defined daily work hours from 0730 to 1600 hours. If appropriate, potential consideration for readjustment after 30 days.

(Isbell Dep. pp. 176-187; Isbell Dep. Ex. 20).

**ANSWER**: Objection, irrelevant and immaterial. Any document issued ISBELL on May 5, 2005, is irrelevant to her claims asserted against JCI for conduct occurring over 3 years later, prior to any request for reasonable accommodation was made. Without waiving said objection, for the purposes of JCI's Motion for Summary Judgment only, ISBELL admits the facts alleged by JCI in its DSSOF No. 49.

50. Isbell does not believe there is anything discriminatory about Wisniewski issuing the May 5, 2005 tailored plan to improve her performance. (Isbell Dep. p. 186). As of the date that counseling document was presented to her, Isbell had not previously requested a reasonable accommodation in the form of a flexible work schedule. (Isbell Dep. pp. 186-187). As of the date that counseling document was presented, Isbell had not previously complained of discrimination in any form. (Isbell Dep. p. 187).

**ANSWER**: Objection, irrelevant, immaterial and asserts a legal conclusion. JCI does not refer to or cite DSSOF paragraphs 50 in its Memorandum. More compelling is that the relevant

time period here is between February 2006 and August 2009. Any performance review (and the contents therein) received prior to 2006 is not material – not to mention ISBELL was terminated for attendance and not poor performance. Further, whether ISBELL believed she was discriminated against in 2005 – almost 3 years before she filed her April 15, 2009 EEOC charge is not only a legal conclusion, it is irrelevant and not offered for any reason other than to unduly burden ISBELL's counsel in having to respond. Without waiving said objection, for the purposes of JCI's Motion for Summary Judgment only, ISBELL admits the facts alleged by JCI in its DSSOF No. 50.

51.     Isbell's 2005 Performance Review, also completed by Wisniewski, was a lower overall appraisal than the 2004 Performance Review. (Isbell Dep. p. 188; Isbell Dep. Ex. 21). Isbell's performance in the following areas was designated by Wisniewski as "Needs improvement":

- Uses time efficiently
- Sets goals and objectives
- Works in an organized manner
- Identifies problems in a timely manner
- Resolves problems in early stages
- Keeps commitments
- Follows policies and procedures
- Builds rapport up, down, and across the organization

(Isbell Dep. pp. 188-189; Isbell Dep. Ex. 21). With regard to following JCI's policies and procedures, Wisniewski noted as follows: "Anna has been lax in following the organization's policies and procedures." (Isbell Dep. Ex. 21). Isbell never complained to anybody at JCI about any form of discrimination related to Wisniewski's review of her performance in 2005. As of the date of that Performance Review, Isbell had not previously requested a reasonable accommodation or flexible work schedule, nor had she complained about discrimination in any form. (Isbell Dep. p. 190).

**ANSWER**: Objection, irrelevant, immaterial and asserts a legal conclusion. JCI does not refer to or cite DSSOF No. 51 in its Memorandum. Also, any performance review (and the contents therein) received prior to 2006 is not material as ISBELL was terminated for attendance and not poor performance. And, any reference regarding ISBELL's belief as to whether she was discriminated against in 2005 – almost 3 years before she filed her April 15, 2009 EEOC charge is not only a legal conclusion, it is irrelevant and not offered for any reason other than to unduly burden ISBELL's counsel in having to respond. Without waiving said objection, for the purposes of JCI's Motion for Summary Judgment only, ISBELL admits the facts alleged by JCI in its DSSOF No. 51.

### Wisniewski Retired In January/February 2006
### And Mahina Ghita Became Isbell's Supervisor For A Short Time
### Until He Was Terminated For Inappropriate Conduct Toward Isbell

52. In January/February 2006, Wisniewski retired as the Laboratory Manager and Mahina Ghita ("Ghita") was hired to take over that position. (Isbell Dep. p. 190).

**ANSWER**: For the purposes of JCI's Motion for Summary Judgment only, ISBELL admits the facts alleged by JCI in its DSSOF No. 52.

53. Ghita was terminated in May 2006, principally for engaging in sex-based harassment toward Isbell. (Isbell Dep. pp. 191-192). More specifically, Ghita was terminated for inappropriately hugging Isbell. (Isbell Dep. p. 193). JCI investigated Isbell's complaint against Ghita and did not retaliate against her for making that complaint of harassment. Isbell agrees that JCI properly handled her complaint of harassment against Ghita. (Isbell Dep. pp. 193-194).

**ANSWER**: Objection, irrelevant and immaterial. Any reference to Mahina Ghita and JCI's investigation of ISBELL's sex-based harassment in May 2006 is wholly immaterial to the

facts of this case. It does not relate to any single allegation alleged by ISBELL, nor are these alleged uncontroverted facts referenced by JCI in its Memorandum. Without waiving said objection, for the purposes of JCI's Motion for Summary Judgment only, ISBELL admits the facts alleged by JCI in its DSSOF No. 53.

### In 2006, Derby Became The Laboratory Manager, Isbell Continued To Arrive Late, And Her Difficulty With Focus and Concentration Escalated

54.   In September 2006, Derby became Isbell's supervisor. (Isbell Dep. p. 194; Derby Dep. pp. 19-20). After Wisniewski retired in January/February 2006, Isbell began coming to work at 9:30 a.m. (Isbell Dep. p. 222). Isbell attributes her late arrival to her attention and focus issues resulting in her "sleep walking throughout the day." No matter how early she arrived, she was not functional before 10:00 a.m. or 11:00 a.m. (Isbell Dep. p. 198). In the time period between Ghita's termination and Derby's hire, Brent Gross ("Gross") was performing duties as the Materials Laboratory Manager and loosely supervised Isbell. Gross never said anything about Isbell arriving late. (Isbell Dep. p. 196). Isbell admits that she had been arriving at work beyond the 30 minute Technology Attendance Guidelines grace period. (Isbell Dep. pp. 198-199).

**ANSWER**:   For the purposes of JCI's Motion for Summary Judgment only, ISBELL admits the facts alleged by JCI in its DSSOF No. 54. Further answering, JCI did not discipline ISBELL (provide written warnings) or assess attendance penalty points against ISBELL for arriving after the 30 minute grace period until after she re-requested a reasonable accommodation pursuant to the ADA (after October 7, 2008).[21]

### Isbell's Diagnosis, Treatment, And Drugs Prescribed For ADHD, And Bi-Polar II Disorder

---

[21] See Dkt.#52, at ¶¶70, 89.

55.     Isbell testified that sometime after 2003, she was treated by Dr. Lakshmi Martin ("Martin"), of the Alexian Brothers Center for Mental Health ("Alexian"), and diagnosed with Bi-Polar II Disorder and Attention Deficit Hyperactivity Disorder ("ADHD"). (Isbell Dep. pp.74-79).[22]

**ANSWER**:     For the purposes of JCI's Motion for Summary Judgment only, ISBELL admits the facts alleged by JCI in its DSSOF No. 55.

56.     Isbell was treated by Dr. Martin until 2008, when Dr. Deepak Kapoor ("Kapoor") became a staff psychiatrist at Alexian. Dr. Kapoor began treating Isbell in the fall of 2008. (Deepak Kapoor Deposition ("Kapoor Dep.") pp. 14-15; Kapoor's deposition transcript is attached as Tab Q).

**ANSWER**:     For the purposes of JCI's Motion for Summary Judgment only, ISBELL admits the facts alleged by JCI in its DSSOF No. 56.

57.     Dr. Kapoor testified that a person with ADHD "has trouble focusing, they have trouble organizing, they get very scattered and their mind races, If they have to do a task that requires concentration, they have trouble doing that and they can get irritable, agitated and they also could have some memory problems because of that." (Kapoor Dep. p. 16).

**ANSWER**:     For the purposes of JCI's Motion for Summary Judgment only, ISBELL admits the facts alleged by JCI in its DSSOF No. 57.

58.     Dr. Kapoor also testified that "Bipolar 2 Disorder is kind of a mood disorder where a person has periods of hyperactivity or their mind races a lot, they become hyper-energized, they cannot sleep, they have desire to do too many things and then it can alternate

---

[22] Medical records received from Alexian clarify that Ms. Isbell first sought treatment in 2005. Because these document are marked "Confidential" pursuant to the parties' Agreed Protective Order, there is no need to attach the confirming document. It is not expected that Isbell will dispute that she sought treatment from Dr. Martin in 2005.

with periods of depression where they feel low, they lose their energy, they sleep more and they get depressed, they feel bad about themselves." (Kapoor Dep. pp. 16-17).

    **ANSWER**:   For the purposes of JCI's Motion for Summary Judgment only, ISBELL admits the facts alleged by JCI in its DSSOF No. 58.

    59.    One of the drugs prescribed to Isbell for ADHD was Ritalin. (Kapoor Dep. p.19). The Ritalin prescribed to Isbell was "immediate release" meaning that it takes approximately 30 minutes to be absorbed into a person's body after ingestion. Ritalin starts having a beneficial effect on a person taking it approximately one hour after ingestion. (Kapoor Dep. p. 20). Though Isbell testified at her deposition that Ritalin takes 3-4 hours to have an effect on her, Dr. Kapoor denied the accuracy of Isbell's testimony. (Isbell Dep. pp. 81-82; Kapoor Dep. p. 20).

    **ANSWER**:   Objection, argumentative and mischaracterizes the testimony. Not only is DSSOF No. 59 (sentence 4) argumentative, it intentionally misleads this Court as to the accuracy of ISBELL's testimony. It is egregiously improper. JCI intentionally misstates ISBELL's testimony and then asserts Dr. Kapoor denied the accuracy of ISBELL's testimony. Contrary to JCI's statement of "fact" in paragraph 59, ISBELL actually testified as follows:

> Q: How long does it take for Concerta to kick in after you ingest it?
>
> A: Three to Four hours.
>
> Q: Ok. And what about the Ritalin or the Methylin?
>
> A: This is a complex medical question. The Ritalin is supposed to enhance the effectiveness of the Concerta. At the dosage I was taking it at John Crane while I was at John Crane, the kick-in time was approximately the same. So its very hard to differentiate the Concerta from the Ritalin. In fact, Concerta is merely an extended release form of Ritalin.
>
> Q: Ok. So the ***Concerta and the Ritalin*** takes three to four hours to kick in?

A: Yes.

(Emphasis added) (See Dkt.#59, Exhibit B.1, at pg. 81, lines 15-24, pg. 82, lines 1-6.) When JCI's counsel asked Dr. Kapoor during his deposition whether it is accurate to say that immediate release **Ritalin** does not take three to four hours to kick in, Dr. Kapoor responded, "No. Its sooner than that."[23]  What counsel for JCI intentionally failed to cite from the same record is that Dr. Kapoor also stated that while Ritalin takes about an hour to "kick-in," ISBELL's main treatment was Concerta and Concerta is a long acting Ritalin designed to release very slowly over a period of a whole day – it will start acting in two to three hours and then peak in about six to eight hours.[24]  Dr. Kapoor <u>never</u> denied the accuracy of ISBELL's lay testimony and any attempt by JCI's counsel to skew pieces of out of context statements of the deposition transcripts to fit its desperate version of the facts is egregiously argumentative, improper. Without waiving said objection, for the purposes of JCI's Motion for Summary Judgment only, for the foregoing reasons, ISBELL disputes DSSOF No. 59 (sentence 4) and admits the remaining facts alleged by JCI in its DSSOF No. 59.

60.     Another drug prescribed to Isbell for ADHD was Concerta. (Kapoor Dep. p. 20). Dr. Kapoor testified that "Concerta is a long-acting Ritalin, so it takes much longer.  It's medication that's designed – it's a special pill which releases the Ritalin very slowly over a period of a full day. So it's designed for 12 hours or a little less than that. So it will start acting in maybe two, three hours and then peak in about six to eight hours and then start going down by the 12th hour, by the end of the day."  (Kapoor Dep. p. 21).

**ANSWER**:    For purposes of JCI's Motion for Summary Judgment only, ISBELL admits the facts alleged by JCI in its DSSOF No. 60

---

[23] See Dkt.#59, Exhibit Q, at pg. 20, lines 11-14.
[24] See Dkt.#59, Exhibit Q, at pg. 21, lines 1-9, pg. 22, lines 1-5.

61.     The drugs prescribed to Isbell did not have to be ingested at a specific time each day. (Isbell Dep. p. 220).

**ANSWER**:     For the purposes of JCI's Motion for Summary Judgment only, ISBELL admits the facts alleged by JCI in its DSSOF No. 61.   Further answering, while ISBELL's medications did not have to be ingested at a specific time each day, Dr. Kapoor informed JCI that ISBELL could not take her medications earlier in the morning than she was already taking them.[25]

### Between September 2006 and October 2008, Derby Allowed Isbell Latitude In Arriving At Work Late Due To Her Difficulties In The Morning; Yet, She Routinely Abused That Latitude

62.     Sometime after Derby became the Laboratory Manager in September 2006, Isbell told him generally that she had some issues with focus and attention that made it difficult for her to arrive at her scheduled start time and asked Derby if she could arrive a bit later in the morning. Derby told Isbell that he had no issue with her arriving after 8:30 a.m., as long as her projects were completed on a timely basis. (Derby Dep. p. 39). Derby made it clear that he was only permitting Isbell to arrive late as needed on the days she was having difficulties in the morning hours.  (Derby Dep. pp. 39-40).  Between 2006 and 2008, Derby wanted to be as flexible as possible in addressing Isbell's difficulties arriving at work on time. (Derby Dep. p. 94).

**ANSWER**:  For purposes of JCI's Motion for Summary Judgment, ISBELL admits the facts alleged by JCI in DSSOF No. 62 (only sentences 1, 2 and 4).   ISBELL disputes the fact contained in DSSOF No. 62. (sentence 3).   Immediately after Derby was hired by JCI, ISBELL informed Derby of her flexible work schedule and, Derby, without further explanation from ISBELL, continued to allow her the accommodation to start work between 10:00 a.m. and 10:30

---

[25] See Dkt.#52, at ¶76, Exhibit EE.

a.m.[26]  Derby never told ISBELL that he was permitting ISBELL to arrive between 10:00 and 10:30 a.m. only as needed on the days she was having difficulty in the morning hours.[27]

63.     Eventually, Derby requested that Isbell submit a doctor's note, as opposed to only verbally representing her difficulties in arriving at work in the morning. (Derby Dep. pp. 89-90).  On or about June 28, 2007, Isbell submitted a note from Dr. Martin which stated that:

> To Whom It May Concern:
>
> Anna Jo Isbell, DOB – 12/25/78, is under my care for the treatment of Attention Deficit Disorder. She would greatly benefit from a flexible work schedule to accommodate her challenge with focus & attention.

(Isbell Dep. Ex. 22).

**ANSWER**:     For the purposes of JCI's Motion for Summary Judgment only, ISBELL admits the facts alleged by JCI in its DSSOF No. 63.

64.     As a result of Dr. Martin's note, it was understood between Derby and Isbell that she could arrive by 10:00 a.m.  (Isbell Dep. pp. 222-227).  Isbell admits there is no medical reason for the 10:00 a.m. start time. (Isbell Dep. p. 224). Isbell also admits that JCI's Attendance/Tardiness Policy applied to her while she was permitted to arrive at 10:00 a.m. (Isbell Dep. pp. 226-227).

**ANSWER**:     Objection, mischaracterizes ISBELL's testimony.  ISBELL testified that the first accommodation she received from JCI relative to a later start time was the result of Dr. Martin's doctor's note stating that "she would greatly benefit from a flexible work schedule to accommodate her challenge with focus and attention" as a result of Attention Deficit Disorder.[28]  When asked by JCI's counsel during her deposition if, in addition to the content contained in Dr. Martin's doctor's note, there was any "other" medically related reason ISBELL had a 10:00 a.m.

---

[26] See Dkt.#52, at ¶21, Exhibit A, at ¶11.
[27] Id.
[28] See Dkt.# 59, at Exhibit B.1, at pg. 222, lines 13-21.

start time, ISBELL responded, "no."[29]  Without waiving said objection, for purposes of JCI's

Motion for Summary Judgment, for the foregoing reasons, ISBELL disputes DSSOF No. 64

(sentence 2) and admits the remaining facts contained in DSSOF No. 64.

65.     Isbell's 2008 Performance Review, completed by Derby, noted the following

under the "Summary" heading:

> AJ received special consideration in light of a letter from her doctor, allowing
> her to start work at 10:00 am (compared to the normal 8:00 am start time), but
> AJ has routinely arrived at work late (often after 10:30 am).

(Isbell Dep. Ex. 23). Isbell admits that arriving at work after 10:30 a.m. is a violation of JCI's

Attendance/Tardiness Policy and the Technology Attendance Guidelines. (Isbell Dep. pp. 229-

230). Isbell does not contend there is anything discriminatory about Derby commenting on her

attendance issues. (Isbell Dep. p. 232).

**ANSWER**:    Objection, irrelevant, immaterial and asserts a legal conclusion.   In

addition to again not being referenced in JCI's Memorandum, ISBELL's opinion on arriving to

work at 10:30 a.m. is immaterial and does not affect the outcome of the case.  Further, ISBELL's

contention that there is "nothing 'discriminatory' about Derby commenting on her attendance

issues" is a legal conclusion and thus, improper.  Without waiving said objection, for purposes of

JCI's Motion for Summary Judgment, ISBELL admits the facts contained in DSSOF No. 65.

66.     In Isbell's 2008 Performance Review, Derby also noted that Isbell "Needs

improvement" with regard to "keeps commitments & meets deadlines."  Specifically, Derby

noted "....she has had some difficulty balancing team responsibilities with her own individual

responsibilities.   Occasionally she requires prompting to fulfill her commitments and meet

deadlines." (Isbell Dep. Ex. 23). Isbell was not "turning around" the material conformance tests

---

[29] See Dkt.# 59, at Exhibit B.1, at pg. 224, lines 6-8.

and positive material identification tests, which affected the Company's performance. (Derby Dep. pp. 48-49). Isbell's problems with these duties worsened over time. (Derby Dep. p. 49).

**ANSWER**:    For purposes of JCI's Motion for Summary Judgment, ISBELL admits DSSOF No. 66 (only sentences 1 and 2).  ISBELL disputes the remaining facts alleged by JCI in DSSOF No. 66.  Derby testified that he was pleased with ISBELL as an engineer and when she worked on a project he was satisfied – she did a good job.[30]  Additionally, Derby testified that there were times when ISBELL had over 400 material conformance tests per month, when it is more typical to have 200 per month.  During those times when the conformance tests numbered over 400 per month there was a backlog.[31]

67.    Derby received complaints about Isbell's inability to timely perform the materials conformance tests and positive material identification from internal customers in the Customer Service Department. (Derby Dep. pp. 46-47). Longoria was one of the internal customers that complained about Isbell.  (Derby Dep. pp. 47-48; Longoria Decl. ¶¶4-10).  In addition to Longoria, Liewehr spoke to Derby multiple times between September 2006 and August 2009 to complain about parts not being tested by Isbell on a timely basis. (Liewehr Decl. ¶¶7-8). Further, Singer also had multiple discussions with Derby about delays resulting from Isbell's failure to perform tests on a timely basis.  (Singer Decl. ¶¶5-6).  Finally, Shoukathullah complained to Derby several times in 2007 and 2008 with regard to Isbell not completing tests when the Customer Service Department needed them to be done. (Shoukathullah Decl. ¶¶6-8).

**ANSWER**:    ISBELL disputes DSSOF No. 67.  ISBELL's personnel file is devoid of any internal customer complaints alleged by JCI.  Walt Burdorf, Director of JCI Human Resources, testified that complaints regarding an employee's job performance are required to be

_____

[30] See Dkt.# 52, at ¶10.
[31] See Exhibit 2, at pg. 77, lines 9-21.

stored in an employees personnel file and managers and/or supervisors are required to investigate said complaint.[32] Thereafter, the decision regarding the investigation is required to be placed in the employee's personnel file.[33] If a supervisor or manager does not document a complaint about an employee's job performance, "…it didn't happen."[34]

68.    If Isbell did not perform the tests early in the morning, as required by the internal customers, Kleck would often have to assist and therefore not timely tend to his metallurgical duties. In addition, Derby would also have to assist at the risk of not keeping his daily schedule, including not being able to work onsite at JCI's Crystal Lake facility.  (Derby Dep. p. 69; Longoria Decl. ¶9; Liewehr Decl. ¶¶7; Singer Decl. ¶8; Shoukathullah Decl. ¶9).

**ANSWER**:    Objection, hearsay.  JCI offers DSSOF No. 68 (sentence 1) to prove its burden of undue hardship.  JCI does not include in the record any declaration or affidavit from Kleck as to him specifically performing certain of ISBELL's duties, nor does the record contain <u>any evidence</u> that he was unable to timely perform his own duties as a result of assisting ISBELL. JCI cites, as support, declarations from certain internal customers, Longoria, Liewehr, Singer and Shoukathuulah, none of whom attest to the fact they have first hand knowledge that Kleck's assistance to ISBELL prevented him from timely tending to his own metallurgical duties or that Kleck failed to timely perform his duties for them specifically because he was assisting ISBELL. Without waiving said objection, for purposes of JCI's Motion for Summary Judgment only, ISBELL disputes DSSOF No. 68 (sentence 1) as it is not supported by the record and admits the remaining facts alleged in DSSOF No. 68.

### In October 2008, Wasser Required A Uniform Start Time For Employees In The Materials Lab

---

[32] See Exhibit 1, at pg. 35, line 24, pg. 36, lines 1-24, pg. 37, lines 1-10.
[33] See Exhibit 1, at pg. 36, lines 11-18.
[34] See Exhibit 1, pg. 37, lines 1-10.

69.    In 2008, Wasser assumed overall leadership duties for the test laboratories, including the materials laboratory. (Wasser Dep. pp. 14-16). Wasser wanted supervisors under him to more closely monitor attendance and enforce JCI's Attendance/Tardiness Policy. Under prior leadership, "things were a little bit more relaxed." (Derby Dep. pp. 38-39).

**ANSWER**:    For the purposes of JCI's Motion for Summary Judgment only, ISBELL admits the facts alleged by JCI in its DSSOF No. 69.

70.    In September 2008, Wasser asked Derby to provide a list of the start times for the employees in the materials laboratory. (Wasser Dep. Ex. 1, attached as Tab C.2). Derby responded to Wasser's e-mail with a list of the actual start times (when an employee typically arrived as opposed to when they were supposed to arrive) and indicated that Isbell's typical work hours were 10:00 a.m. to 6:30 p.m. (Wasser Dep. Ex. 1; Derby Dep. pp. 40-41). Sometime thereafter, Wasser informed Derby that he wanted the employees in the materials laboratory to work a uniform schedule from 8:30 a.m. to 5:00 p.m. (Wasser Dep. Ex. 1). Wasser changed the start time for employees in the materials laboratory to better align with customer needs. (Wasser Dep. p. 59). A number of internal customers had complained to Wasser about issues pertaining to the on-time delivery of JCI's products. (Derby Dep. p. 105).

**ANSWER**: Objection, contradicts the documented evidence and mischaracterizes the testimony. In support of DSSOF No. 70 (sentence 2), JCI cites to Exhibit 1 of Wasser's deposition which specifically asks Derby for the starting times of all of his "people", not, as JCI inaccurately stated, when an employee "typically arrived to work."[35]    Derby's response to Wasser's inquiry states ISBELL's work schedule as 10:00 a.m. to 6:30 p.m.[36]    On its face, Derby's response did not state that 10:00 a.m. to 6:30 p.m. was ISBELL's "typical work hours" –

---

[35] See Dkt.#59, Exhibit C.2, at Exhibit 1.
[36] See Dkt.# 52, at ¶28.

nor does Derby inform Wasser that 10:00 a.m. was when ISBELL typically arrived to work.[37]

Any statement made by Derby during his deposition is clearly an after-acquired, self-serving statement contradicted by the documented evidence in the record. Regarding DSSOF (sentences 3 and 4), Wasser testified that he wanted coverage in the laboratory from 6:00 a.m. to preferably 6:00 p.m. and for the managers to meet with their people to discuss and set start times.[38] Wasser never instructed Derby to set ISBELL's starting time at 8:30 a.m. – Derby did that on his own. Without waiving said objection, for the purposes of JCI's Motion for Summary Judgment only, for the foregoing reasons, ISBELL disputes DSSOF No. 70 (sentences 2, 3 and 4) and for the same reasons set forth in ISBELL's response to DSSOF No. 67, ISBELL further disputes the facts alleged by JCI in its DSSOF No. 70 (sentence 5). For purposes of JCI's Motion for Summary Judgment only, ISBELL admits the fact alleged in DSSOF No. 70 (sentence 1)

    71.    On or about October 7, 2008, Derby met with Isbell and the other employees in the materials laboratory to inform them about the new scheduled hours of 8:30 a.m. to 5:00 p.m. Isbell sent an e-mail to Derby on October 7, 2008, expressing her disapproval with the 8:30 a.m. start time. (Isbell Dep. Ex. 25). Isbell admits there is no policy or document that prohibited Wasser from requiring his employees to start at 8:30 a.m. (Isbell Dep. pp. 248-249). Derby responded to Isbell as follows:

> AJ – It is my understanding that all people under the engineering group are being asked to follow a scheduled attendance which includes "regular work hours" so that they are available for technical support and are not alone in the building during "non regular work hours". Your new work schedule (8:30 to 5:00), which is to be implemented immediately, will allow for improved efficiency, better communication, and better work flow.
>
> Your Doctor's note, dated June 28, 2007, will be given to

---

[37] Id.
[38] See Dkt.# 52, at ¶27.

Jan Tuton.

Jim Derby
Lab Manager

(Isbell Dep. Ex. 25).

**ANSWER**:    Objection, immaterial.    ISBELL's admission that there is no policy or document prohibiting Wasser from requiring employees to start at 8:30 a.m. is completely immaterial. ISBELL does not contend that Wasser was not allowed to require employees to start at a certain time – only that she had an accommodation in effect prior to and on October 7, 2008 (the date Derby, without warning, informed ISBELL that her new start time was 8:30 a.m.).  Without waiving said objection, for purposes of JCI's Motion for Summary Judgment only, ISBELL admits the facts alleged in DSSOF No. 71.

### Isbell's Request For Reasonable Accommodation Under The ADA

72.    On October 7, 2008, Isbell submitted a request for a reasonable accommodation to Tuton, requesting to work flexible hours from 10:00 a.m. to 6:30 p.m. (Isbell Dep. p. 251; Isbell Dep. Ex. 26). The next day, on October 8, 2008, Isbell submitted another document referencing her request for a reasonable accommodation. That document was filled-out and signed by Dr. Kapoor.  Dr. Kapoor noted in pertinent part, as follows:

> Q. Will it be necessary for the employee to take work only intermittently or to work on a less than full schedule as a result of the condition for treatment described in item 6 below?
>
> A. She needs to work night or evening shift as the meds make her drowsy during the day.
>
> Q. If yes, give, the probable duration:
> A. [F]orever
>
> Q. If able to perform some work, is the employee unable to perform any one or more of the essential functions of the employee's job (the employee or the employer should supply you

with information about the essential job functions)? If yes, please list the essential functions the employee is unable to perform:

A. Can work full shift at night.

(Isbell Dep. Ex. 27). Isbell admits there was not a night shift in her department and that Dr. Kapoor's note dated October 8, 2008, does not in any way refer to her need for a 10:00 a.m. start time. (Isbell Dep. p. 255). Isbell also admits that as a result of the documents she submitted on October 7 and 8, 2008, JCI continued to communicate with her regarding her request for a later start time. (Isbell Dep. pp. 274-275).

**ANSWER**:    Objection, immaterial.  DSSOF No. 72 (sentence 5) is not only immaterial, it is self-serving.  JCI cites to a written medical document (Exhibit 27 of ISBELL's deposition), that ISBELL did not prepare, to support its "fact"; JCI's assertion of ISBELL's lay opinion as to the statements contained in a medical document is immaterial.  Without waiving said objection, for purposes of JCI's Motion for Summary Judgment only, ISBELL admits the facts alleged in DSSOF No. 72.  Further answering, while ISBELL admits that JCI continued to communicate with her as a result of the documents she submitted on October 7 and 8, 2008, the only input ISBELL had in the decision to accommodate, aside from her role in physically submitting the medical documentation requested by JCI, was informing Caballero that she wanted a start time between 10:00 and 10:30 a.m.; she was never consulted regarding a 9:15 a.m. start time until the decision was already made.[39]

73.    On October 14, 2008, Isbell and Caballero communicated via e-mail with regard to JCI's intent to issue a medical questionnaire to Dr. Kapoor requesting a broader explanation pertaining to the functional limitations of her conditions and more detail regarding her request for a reasonable accommodation. (Isbell Dep. Ex. 28; Isbell Dep. pp. 275-276). Isbell admits

---

[39] See Dkt.# 52, at ¶52.

that the October 14, 2008 e-mail string evidences that JCI was taking her request for a reasonable accommodation seriously. (Isbell Dep. pp. 278-279). The e-mail string also contains a link to the EEOC's website, referencing the reasonable accommodation process. Isbell admits the EEOC's website contains an explanation that an accommodation provided by an employer does not have to be "the perfect accommodation." (Isbell Dep. pp. 277-278).

**ANSWER**: Objection, immaterial. DSSOF No. 73 (sentences 3 and 4) are wholly immaterial. That ISBELL cited the ADA in an email to JCI as well as her lay interpretation of the ADA and its enforcement provisions is immaterial and does not affect the outcome of the case. Without waiving said objection, for purposes of JCI's Motion for Summary Judgment only, ISBELL admits the facts alleged in DSSOF No. 73.

74. On October 16, 2008, Tuton sent a medical questionnaire to Dr. Kapoor requesting information pertaining to whether Isbell could perform the essential functions of her job with or without a reasonable accommodation. Tuton requested that Dr. Kapoor respond by October 27, 2008. (Isbell Dep. Ex. 29). Isbell admits that JCI was taking her request for a reasonable accommodation seriously by sending the medical questionnaire to Dr. Kapoor and requesting a quick response. (Isbell Dep. p. 283).

**ANSWER**: Objection, irrelevant and immaterial. Whether ISBELL thought JCI was taking her request for a reasonable accommodation seriously and ISBELL's perception of JCI's proactivity during the accommodation process is completely irrelevant. Whatever ISBELL "thought" is not a legal test to determine JCI's compliance with its legal obligations. JCI's inquiry with ISBELL as to the status of Dr. Kapoor's medical response has absolutely nothing to do with JCI's legal obligation to engage *ISBELL in an interactive process* and it is not correlated or material to any element of ISBELL's cause of action and/or JCI's defense. Without waiving said

objection, for purposes of JCI's Motion for Summary Judgment only, ISBELL admits the facts alleged in DSSOF No. 74.

75. Dr. Kapoor did not respond to the medical questionnaire by October 27, 2008. Accordingly, on October 28, 2008, Caballero, on his own initiative, sent an e-mail to Isbell inquiring as to the status of Dr. Kapoor's response. Isbell responded as follows:

> My doctor has been in and out of his office, and has not gotten back to me yet. I believe that it is ok for it to take longer to acquire medical documentation, the clock "stops" as it were while the documentation is being obtained. I was swamped last week and unable to nag the doctor, however I will be doing so this week.
>
> AJ

(Isbell Dep. Ex. 30). Isbell admits that Caballero's e-mail to her dated October 28, 2008, is an example of JCI taking her request for a reasonable accommodation seriously. (Isbell Dep. pp. 285-286). In addition, Isbell admits that Caballero's e-mail is an example of JCI being proactive in seeking to obtain more information about her request for a reasonable accommodation. (Isbell Dep. p. 287).

**ANSWER**: Objection, irrelevant and immaterial. For the same reasons set forth in ISBELL's response to DSSOF No. 74, ISBELL objects to DSSOF No. 75 (sentences 3 and 4). Without waiving said objection, for purposes of JCI's Motion for Summary Judgment only, ISBELL admits the facts alleged in DSSOF No. 75.

76. Though Isbell's start time remained 8:30 a.m. while JCI was in the process of obtaining a response from Dr. Kapoor with regard to her request for a reasonable accommodation, she was arriving at work after 8:30 a.m. (Isbell Dep. p. 289). On November 14, 2008, Caballero reminded Isbell that her start time was 8:30 a.m. and that it was "critical that you arrive promptly so that internal customer issues are addressed." (Isbell Dep. Ex. 31).

**ANSWER**: For purposes of JCI's Motion for Summary Judgment only, ISBELL admits the facts alleged in DSSOF No. 76.

77. On December 8, 2008, well after the October 27, 2008 requested due date, Dr. Kapoor responded to JCI's medical questionnaire issued to him on October 16, 2008. (Isbell Dep. Ex. 29). Dr. Kapoor responded to the following questions as follows:

> Q. Can she currently perform the essential functions of her job, with or without reasonable accommodation?
>
> A. No
>
> [N]eeds to start her day late for optimal function and productivity
>
> Q. Are any accommodations required so that she can perform the essential functions of her job?
>
> A. Yes
>
> [A] later shift or starting late
>
> Q. Upon resolution of her condition, will she be able to perform the essential functions of her job with or without a reasonable accommodation.
>
> A. NA
>
> Q. If so, what accommodation will be required?
>
> A. Start her work day at 10 AM would be optimal

(Isbell Dep. Ex. 29). Dr. Kapoor's response does not state that she could not start work before 10:00 a.m. (Isbell Dep. p. 282). JCI would have been able to act sooner on her request for a reasonable accommodation if Dr. Kapoor had responded before December 8, 2008. (Isbell Dep. p. 284).

**ANSWER**:    Objection, argumentative and speculative.   Dr. Kapoor's December 8, 2008 response is cited by and specifically states that a 10:00 a.m. start time would be "optimal."[40]   More compelling, JCI did not ask Dr. Kapoor whether ISBELL is able to start work before 10:00 a.m.!   JCI is drawing a conclusion from a question never asked and thus, never answered.   In addition, DSSOF No. 77 (sentence 4) is wholly speculative and Courts have struck similar statements.   See Brown v. Local 701 of the Internat'l Brotherhood of Electrical Workers, 2000 U.S. Dist. LEXIS 12630, at *7-8 (N.D. Ill.) (statement that "plaintiff would have been referred for employment 'very soon after he signed  Book IV' if he had left a contact number with the Denver local and 'obtained the necessary temporary work permit while awaiting state examination,'" too speculative to be admitted.)   Without waiving said objection, for purposes of JCI's Motion for Summary Judgment, for the foregoing reasons, ISBELL disputes DSSOF No. 77 (sentences 3 and 4) and admits the remaining facts alleged in DSSOF No. 77.

78.    At his deposition, Dr. Kapoor testified as follows with regard to his use of the word "optimal":

> Q. Does your use of the word "optimal" mean that Ms. Isbell could have started her workday at 9:45 in the morning?
>
> A. Yes, she could have started any time earlier, but she wouldn't be functioning at her peak level. I would use the word optimal again.
>
> Q. Sure.  Is it possible that Ms. Isbell could have started her workday at 9:15 in the morning?
>
> A. It's possible, but it would  not  be optimal.
>
> Q. Understood. Is it possible but not optimal that she could have started her workday at 8:30 in the morning?

---

[40] See Dkt.#59, Exhibit B.2, at Isbell Exhibit 29, pg. 3.

A. That would be even less optimal. In my opinion, she would be kind of half asleep and not be able to do the things in which she could have been required to do.

(Kapoor Dep. pp. 31-32).

**ANSWER**:    For purposes of JCI's Motion for Summary Judgment only, ISBELL admits DSSOF No. 78.

79.    On December 16, 2008, the following e-mail string was exchanged between Caballero and Isbell:

[From Caballero at 11:30 a.m.]

AJ,

Please instruct me as to what is your desired accommodation

[From Isbell at 12:08 p.m.]

I just need some sort of flexibility in working hours. How specifically do you need this worded?

[From Caballero at 2:26 p.m.]

In regards to flexibility are you asking for different starting times from day to day or would you like your schedule to reflect a fixed start that differs from your current situation?

[From Isbell at 6:40 p.m.]

A flexible schedule would be optimum. I mean I have no problem working 40 hours a week, it's just how badly the meds affect me on any given day and when they kick in to wake me up. I realize that it is better for the business the earlier I get here. However in general, arriving around 10-10:30 is much easier for me.

Thank you, (I hope you make it home safely tonight)

(Isbell Dep. Ex. 32). Isbell admits that her e-mail string with Caballero on December 16, 2008 is another example of JCI taking her request for a reasonable accommodation seriously. (Isbell Dep. pp. 297-298).

**ANSWER**:   Objection, irrelevant and immaterial.   Whether ISBELL <u>thought</u> the JCI was taking her request for a reasonable accommodation seriously is completely irrelevant. Whatever ISBELL "thought" is not a legal test to determine JCI's compliance with its legal obligations.   Without waiving said objection, for purposes of JCI's Motion for Summary Judgment only, ISBELL admits the facts alleged in DSSOF No. 79.

80.     Dr. Kapoor's response to the medical questionnaire, dated December 8, 2008, was reviewed and discussed by Caballero and Tuton.   (Caballero Dep. p. 128).   As a group, Caballero, Derby, Wasser, and Burdorf decided how to reasonably accommodate Isbell's needs. (Caballero Dep. p. 139). Caballero drafted a letter dated December 29, 2008, and met with Isbell in person to discuss the letter which contained JCI's position on the reasonable accommodation it was able to provide her. That letter states as follows:

> Dear Anna,
>
> John Crane has been working diligently with you in fulfilling your request to provide an accommodation for your medical condition, which, according to you and your doctor, the medication you are taking occasionally impairs your ability to get to work for your scheduled start time. In response to your request, we will, at least temporarily, allow a later workday start time beyond 8:30 a.m.
>
> In order to meet business objectives, and to reasonably accommodate your medical condition, we will permit you to begin your workday at 9:15 a.m. We will monitor this accommodation and re-visit the facts in 60 days to determine if it mutually meets our respective needs.
>
> Anna, if you have any questions please do not hesitate to contact me at 847-967-3751.   We believe this is a reasonable

accommodation that ultimately addresses the objectives of John Crane and your personal needs.

Yours Sincerely,

Antonio H. Caballero, GPHR, PHR Sr. Human Resources Generalist

(Isbell Dep. Ex. 33). The 30 minute grace period contained in the Technology Attendance Guidelines applied to the 9:15 start time; therefore, Isbell could arrive by 9:45 a.m. and would not receive points under the Attendance/Tardiness Policy. (Isbell Dep. pp. 305-307).

**ANSWER**:    For purposes of JCI's Motion for Summary Judgment only, ISBELL admits the facts alleged in DSSOF No. 80.

81.    On January 5, 2009, Isbell sent an e-mail to Caballero requesting, among other things, clarification as to whether JCI considered her requested start time of 10:00 a.m. as an undue hardship. Caballero responded on January 7, 2008, in part as follows:

Undue Hardship – You asked if John Crane considers your request to start at 10:00 am as an undue hardship. We feel that it is an undue hardship because the customers that this position services are not being serviced in a timely fashion. As you are aware, the customer service component is a critical function of your job.

(Isbell Dep. Ex. 32).

**ANSWER**:    For purposes of JCI's Motion for Summary Judgment only, ISBELL admits the facts alleged in DSSOF No. 81.

82.    In March 2009, Isbell was diagnosed with Ehlers-Danlos Syndrome and treated for this condition by Dr. Eric Gall. (Isbell Dep. pp. 83, 317-318). Isbell communicated her diagnosis to Tuton in an e-mail dated March 31, 2009. (Isbell's e-mail to Tuton dated March 31, 2009, attached hereto as Tab R).

**ANSWER**:    For purposes of JCI's Motion for Summary Judgment only, ISBELL admits the facts alleged in DSSOF No. 82.

83.    On April 7, 2009, Tuton sent a medical questionnaire to Dr. Gall requesting information pertaining to the effects of Ehlers-Danlos Syndrome on ISBELL's ability to arrive at the 9:15 a.m. start time and whether she could perform the essential functions of her job with or without a reasonable accommodation. (Isbell Dep. Ex. 36). On April 20, 2009, Dr. Gall responded and answered the following question as follows:

> Q. Are there any accommodations required so that she can perform the essential functions of her job?
>
> A. Work out a satisfactory (mutually) schedule if possible for her to complete her work.

(Isbell Dep. Ex 36). Dr. Gall's response does not state that she needed a 10:00 a.m. start time. JCI responded to Isbell's request for a reasonable accommodation based on her Ehlers-Danlos diagnosis by sending the medical questionnaire to Dr. Gall. (Isbell Dep. pp. 321).

**ANSWER**:    For purposes of JCI's Motion for Summary Judgment only, ISBELL admits the facts alleged in DSSOF No. 83.  Further answering, while Dr. Gall's response does not *specifically* state that ISBELL needed a 10:00 a.m. start time, the correspondence to Dr. Gall fails to specifically ask Dr. Gall if a 10:00 a.m. start time is necessary – it solely asks what accommodation is required.[41]   Additionally, JCI did not follow up with Dr. Gall regarding his responses nor did JCI consult with any other person with medical knowledge regarding Dr. Gall's responses.[42]

### JCI's Continued Commitment To The Interactive Process And Efforts To Obtain Medical Information From Isbell

---

[41] See Dkt.# 52, at ¶63.
[42] See Dkt.# 52, at ¶68.

84.     In April 2009, Caballero issued a letter to Isbell requesting follow-up information from Dr. Kapoor regarding the medical necessity for her 10:00 a.m. requested start time. (Isbell Dep. pp. 324-325; Isbell Dep. Ex. 38). Caballero requested a response by May 6, 2009. (Isbell Dep. Ex. 38). Isbell did not provide a response by May 6, 2009; consequently, Caballero sent an e-mail to Isbell on May 19, 2009 to follow-up on his prior request for medical information. Caballero reminded Isbell that he had given the medical questionnaire to her on April 21, 2009. (Isbell Dep. Ex. 39). This was the second time Dr. Kapoor had not provided a response to a medical questionnaire by the requested due date. (Isbell Dep. p. 329).

**ANSWER**:     Objection, irrelevant and immaterial.  In addition to JCI's failure to cite or reference DSSOF No. 84 (sentences 2, 3 and 4) in its Memorandum, Dr. Kapoor's timeliness in submitting JCI's requested medical information is immaterial to the outcome of this case.  JCI admits it received the requested medical information and issued its decision thereafter.  Dr. Kapoor's punctuality is immaterial.  Without waiving said objection, for purposes of JCI's Motion for Summary Judgment only, ISBELL admits the facts alleged in DSSOF No. 84.

85.     On May 27, 2009, after the requested due date of May 6, 2009, Dr. Kapoor responded to Caballero's medical questionnaire as follows, in part:

> Q. If you recommend a modified start time as an accommodation, please describe in detail the specific reasons why such a modified starting time is medically necessary?
>
> A. Her acceptable time on most days should be 10 AM as the medicines don't kick in for ADD & BiPolar
>
> Q. Ms. Isbell has informed the Company that a modified starting time is necessary because she is required to take medications that cause her to be unable for work for about two hours. Is this an accurate representation? Will this be the case indefinitely? If not, for how long? Is there any medical reason why Ms. Isbell could not take the

> medications earlier in the day so that she could arrive at work at her department's normal starting time of 8:30 a.m.?
>
> A. [S]hould be reevaluated yearly appears to be permanent condition

(Isbell Dep. Ex. 40). Dr. Kapoor did not answer the question as to whether there was a medical reason why she could not take her medications earlier in the day. (Isbell Dep. p. 333).

**ANSWER**:    ISBELL disputes the last sentence of DSSOF No. 85.   The numerous medical documentation provided by Dr. Kapoor does state a medical reason why ISBELL could not take her medications earlier in the day.   Specifically, Dr. Kapoor states that ISBELL has uncontrolled delayed sleep cycle and that her medications for ADD and Bipolar disorder do not kick in until 10:00 a.m.[43]   For purposes of JCI's Motion for Summary Judgment only, ISBELL admits the remaining facts alleged in DSSOF No. 85.

86.    Throughout April 2009, Isbell was assigned points for being late as set forth by the Attendance/Tardiness Policy.   Derby communicated with Isbell with regard to her late arrivals. (Isbell Dep. Ex. 41). JCI did not assign points to Isbell until after she was 30 minutes late under the Technology Attendance Guidelines. (Isbell Dep. p. 334).

**ANSWER**:    For purposes of JCI's Motion for Summary Judgment only, ISBELL admits the facts alleged in DSSOF No. 86.

87.    On June 23, 2009, Caballero issued a letter to Isbell requesting Dr. Kapoor to supplement one of the answers he submitted on May 27, 2009. Specifically, Caballero requested a response by June 30, 2009 to the following question:

> Q. Is there a medical reason why Ms. Isbell could not take the medications earlier in the day so that she could arrive at work at her department's normal starting time of 8:30 a.m.

---

[43] See Dkt.# 52, at ¶¶38, 72, 77.

(Isbell Dep. Ex. 43). For the third time since October 2008, Dr. Kapoor did not respond by the requested due date and Isbell was given an extension of time to obtain a response from Dr. Kapoor. (Isbell Dep. Ex. 44). Isbell admits that the extension was an example of JCI working with her to obtain the information needed to assess her request for a reasonable accommodation. (Isbell Dep. p. 341).

**ANSWER**:     Objection, irrelevant and immaterial.  Again, Dr. Kapoor's punctuality is immaterial for the reasons set forth in ISBELL's response to DSSOF No. 84.  Further, ISBELL's admission in her deposition that JCI's extension of time for Dr. Kapoor to submit the requested medical information is also immaterial as it has nothing to do with the legal obligation to engage in an interactive process as it relates to ISBELL and her accommodation request and is not correlated to any element of ISBELL's cause of action and/or JCI's defense.  Without waiving said objection, for purposes of JCI's Motion for Summary Judgment only, ISBELL admits the facts alleged in DSSOF No. 87.

88.     Dr. Kapoor eventually responded as follows:

> Q. Is there a medical reason why Ms. Isbell could not take the medications earlier in the day so that she could arrive at work at her department's normal starting time of 8:30 a.m.
>
> A. Due to her condition she has trouble waking up early so she can not take medication at earlier time.

(Isbell Dep. Ex. 45).

**ANSWER**:     For purposes of JCI's Motion for Summary Judgment only, ISBELL admits the facts alleged in DSSOF No. 88.

### JCI Referred Isbell For An Independent Medical Examination

89.     As neither Dr. Kapoor, nor Dr. Gall, fully addressed JCI's questions pertaining to whether there was a medical necessity for Isbell's requested start time, Caballero sent her a letter requesting that she undergo an Independent Medical Examination. That letter stated as follows:

> Dear Anna:
>
> Based on your request and the information provided by your health care providers, on January 5, 2009, John Crane modified your work schedule in an effort to reasonably accommodate your medical condition. As you were informed, the modified starting time was provisional and would be re-visited as time passed. Since then, we have attempted to obtain clarification from your health care providers regarding the medical necessity of the 9:15 a.m. start time (as well as the 10:00 a.m. start time you continue to request). We received Dr. Kapoor's response, dated June 29, 2009, whereby, as previously, he did not explain whether or not there was a medical necessity, as opposed to a personal convenience, for your requested modified starting time. Therefore, we are requesting that you undergo an assessment that will be conducted by an independent medical examiner. For the next several days we will work on locating a doctor that will assist us in determining whether your requested schedule modification is medically required, and if so, what should be the appropriate starting time. Once we have a clear medical picture we can then determine the nature and extent of any reasonable accommodations so that you can perform the essential functions of your job.
>
> To be clear, this doctor will not be affiliated with John Crane and will provide an unbiased assessment of your medical condition. We will notify you once we have selected the doctor.
>
> Sincerely,
>
> Antonio H. Caballero
> Sr. HR Generalist

(Isbell Dep. Ex. 46)

**ANSWER**:    ISBELL disputes the fact alleging Dr. Kapoor and Dr. Gall did not fully address JCI's questions pertaining to whether there was a medical necessity for ISBELL's requested start time.  JCI admitted that no individual involved in the decision to accommodate

had any medical background or medical training and further that none of the JCI employees involved in the decision to accommodate consulted with any medical provider or person with any medical knowledge whatsoever, including but not limited to Dr. Kapoor, Dr. Gall and other medical providers, regarding the medical documentation ISBELL submitted to JCI.[44] The medical documentation submitted by Drs. Kapoor and Gall specifically state, *inter alia*, that ISBELL has uncontrolled delayed sleep cycle and that her medications for ADD and Bipolar disorder do not kick in until 10:00 a.m.[45] With regard to the remaining facts alleged in DSSOF No. 89, for purposes of JCI's Motion for Summary Judgment only, ISBELL admits said remaining facts.

90.     In August 2009, per JCI's request that she undergo an Independent Medical Examination, Isbell was thoroughly evaluated by David E. Hartmann, Ph.D., a clinical psychologist and neuropsychologist. (Isbell Dep. Ex. 55). Under the "Conclusion" heading, Dr. Hartmann noted in part that:

> Ms. Isbell has limited insight into the pattern of her difficulties and has difficulty comprehending the discrepancy between her intellectual gifts and her diagnosed psychiatric symptoms. It is likely that her current intransigence related to employment start time is a symptom of incompletely treated psychiatric symptoms of Bipolar Disorder and her own misattribution of those symptoms.
>
> ****
>
> With more aggressive psychiatric medication management and supportive psychotherapy, I believe that Ms. Isbell's prognosis is good, although like all individuals with Bipolar Disorder, she will need to have her symptoms and medications monitored for life. With better symptomatic control, Ms. Isbell should be able to begin work at the requested hour. At present, however, until her symptoms are under better control, I concur with Dr. Kapoor's statement that Ms. Isbell has credible psychological justification for starting work somewhat later.

---

[44] See Dkt.# 52, at ¶¶48, 53, 68, 73.
[45] See Dkt.# 52, at ¶¶38, 72, 77.

(Isbell Dep. Ex. 55).

**ANSWER**:    For purposes of JCI's Motion for Summary Judgment only, ISBELL admits the facts alleged in DSSOF No. 90.

### Isbell's 2009 Performance Review Continues To Reflect Her Violations Of The Attendance/Tardiness Policy And Her Inattentiveness To The Needs Of Internal Customers

91.    Isbell's 2009 Performance Review, completed by Derby and presented to her on July 14, 2009, noted serious issue pertaining to her attendance and complaints about her by internal customers. Under the "Job Knowledge" heading, Derby stated in part that:

> Moreover, Anna fails to understand the business implications of her decisions.    For instance, John Crane personnel in manufacturing production start work early in the day, and they need technical support by 9:00 a.m. Yet Anna routinely arrived 30 minutes late (arriving at 9:45 am) forcing other lab personnel to cover her responsibilities.    This is concerning because Anna was provided an accommodation whereby her start time was changed from 8:30 am to 9:15 am.    Many internal customers have complained to the laboratory manager about the lack of technical support from Anna. For example on May 19, 2009, Jim Wasser complained that your 10:06 am start prevented a necessary quick response to a customer inquiry.

Under the "Teamwork" heading, Derby stated in part that:

> Many internal customers have complained verbally about the lack of responsiveness from Anna in the areas of material conformance testing, positive material identification, and Seal Performance Evaluation Requests.    This demonstrates a lack of ability of balancing team and individual responsibilities.

Under the "Summary" heading, Derby stated that:

> Anna has worked at a satisfactory level in some areas – indicated by her "Effective" rating respectively, but overall Anna has fallen seriously behind in her job performance this year. Many internal customers have complained about the lack of technical support from Anna, which has caused poor

efficiency for the company. Her starting time was 8:30 so that she would be available for giving technical assistance to internal customers, but an accommodation was granted which allowed her to start work at 9:15 am. She comes to work about 30 minutes late (about 9:45) nearly every day. Anna received her first written warnings and a final warning because of her habitual tardiness. Anna often disappears from the materials laboratory for long periods of time and has been observed talking to other employees outside of the materials laboratory about non-work related issues. Her performance must improve immediately.

(Isbell Dep. Ex. 47).

**ANSWER**:   For purposes of JCI's Motion for Summary Judgment only, ISBELL admits that Exhibit 47 to the ISBELL Deposition says what it says. Further answering, Walt Burdorf (Director of JCI's HR) testified that if an internal employee complaint regarding job performance is not documented and stored in the employee's personnel file, then "it didn't happen."[46]   Therefore, according to JCI's executive in charge of all JCI employees, since ISBELL's personnel file has not produced a single timely written complaint from any of ISBELL's internal those internal customer complaints "didn't happen".

92.   Isbell does not dispute the attendance issues that were noted on her 2009 Performance Review. (Isbell Dep. pp. 346-347). Isbell also acknowledges that there were customer complaints and customer issues "as my health condition deteriorated." (Isbell Dep. p. 347). Despite her admitted issues with attendance and dealing with internal customers, Isbell rated her work in 2009 as "Excellent." (Isbell Dep. p. 352; Isbell Dep. Ex. 49).

**ANSWER**:   For purposes of JCI's Motion for Summary Judgment only, ISBELL admits the facts alleged in DSSOF No. 92. Further answering, Walt Burdorf (Director of JCI's HR) testified that if an internal employee complaint regarding job performance is not

---

[46] See Exhibit 1, at pg. 36, lines 5-24, pg. 37, lines 1-12.

documented and stored in the employee's personnel file, then "it didn't happen."[47]   Therefore,

according to JCI's executive in charge of all JCI employees, since ISBELL's personnel file has

not produced a single timely written complaint from any of ISBELL's internal customers those

internal customer complaints "didn't happen".

93.      Isbell does not believe that arriving at work when told to by her employer is an

essential function of her job. Specifically, Isbell testified as follows:

> Q. Okay. Don't you think it's an essential function of your job to
> show up when you're told to by your employers?
>
> A. I do not believe it was an essential function of my job
> description.

(Isbell Dep. p. 355).

**ANSWER**:   For purposes of JCI's Motion for Summary Judgment only, ISBELL

admits that she stated she does not believe it was an essential function of her *job description* to

show up to work when her employer tells her; ISBELL disputes the remaining facts alleged in

DSSOF No. 93 as they do not accurately support the testimony cited.

**Isbell Received A Written Warning, Final Warning, And Was Terminated
For Violating JCI's Attendance/Tardiness Policy
And Not Following The Technology Attendance Guideline**

94.      On May 5, 2009, Isbell was issued a Written Warning due to the accumulation of

points under the Attendance/Tardiness Policy and for not following the Technology Attendance

Guidelines. (Isbell Dep. Ex. 51). Isbell does not dispute that she was late on the dates noted on

the Written Warning. (Isbell Dep. p. 356). On June 18, 2009, Isbell was issued a Final Warning

due to the accumulation of points under the Attendance/Tardiness Policy and for not following

the Technology Attendance Guidelines. (Isbell Dep. Ex. 52). Isbell does not dispute that she

was late on the dates noted on the Final Warning. (Isbell Dep. p. 357).

---

[47] See Exhibit 1, at pg. 36, lines 5-24, pg. 37, lines 1-12.

**ANSWER**: For purposes of JCI's Motion for Summary Judgment only, ISBELL admits the facts alleged by JCI in its DSSOF No. 94.

95. On August 26, 2009, Isbell was issued a termination letter due to the accumulation of points under the Attendance/Tardiness Policy and for not following the Technology Attendance Guidelines. (Isbell Dep. Ex. 53). Isbell does not dispute that she was late on the dates noted on the termination letter. (Isbell Dep. p. 358).

**ANSWER**: For purposes of JCI's Motion for Summary Judgment, ISBELL admits the facts alleged in DSSOF No. 95.

## Isbell Has No Viable Sex Discrimination Claims
## And Essentially Waived Those Claims During Her Deposition Testimony[48]

96. Isbell has no evidence supporting her sex discrimination claims. Isbell testified as follows at her deposition:

> Q. Now, we have spent a lot of time talking today about your disabilities claims. I want to talk now about your sex discrimination claim.
>
> Do you contend that Ron Kleck and Joe Dauven were treated better than you because they're male?
>
> A. Yes.
>
> Q. I want you to tell me every reason why Ron Kleck and Joe Dauven were treated better than you because they're male.
>
> A. I don't have any proof at this time.
>
> Q. Can you tell me one male employee who had the same attendance issues as you and was not discharged?
>
> A. Ron Kleck.
>
> Q. And --

---

[48] In view of her deposition testimony, it is surprising that Isbell continues to prosecute her sex discrimination claims

A. And Jim Derby for that matter.

Q. Now, when you were here on May 18, I asked you if you had looked at Ron Kleck's personnel file that we tendered to in discovery. You hadn't looked at it as of May 18. Have you looked at it since then?

A. No.

Q. So have you seen any document or can you direct me to any documents that states that Ron Kleck had -- and Jim Derby had the same attendance issues that you did and were not discharged?

A. No, I cannot prove it.


Q. And can you tell me one male employee in the engineering department whose performance was as bad or worse than your –

A. I –

Q. – in 2009.

A. I have no means of determining that.

Q. And can you tell me one male employee in the chem lab who has been granted leeway in their work schedules in the form of late arrivals, early departures that you were not granted?

A. Again, I believe both Ron Kleck and Jim Derby, but I cannot prove it.

Q. Tell me every male employee in the engineering department who has less experience than you and fewer qualifications but was promoted?

A. Promotions were kept generally confidential at John Crane, so I cannot give you a list.

Q. But these are allegations you made in your complaint.

A. Yes.

Q. But you can't give me a list to support these allegations; is that correct?

A. At this time no.

Q. What would enable you to give me a list of these employees who were less qualified than you and were promoted?

A. I can't produce any document. It's not just promotion though. It is pay raises as well.

Q. Well, are you able -- do you know what other -- what the male employees in your department received in the form of pay raises?

A. I have an idea, but it was kept generally confidential.

Q. So aren't you just guessing as to whether male employees received pay raises that you didn't or promotions that you didn't or given leeway in attendance that you weren't?

A. I have my own observations.

Q. But you can't offer me any evidence in support of those observations, correct?

A. At this point in time, no.

Q. And aren't pay raises tied to performance?

A. Yes.

Q. Okay. And in 2009 your performance needed improvement, right?

A. Prior to 2009 it was generally effective.

Q. Even though in 2005, under Florian Wisniewski, you were put on a tailored plan for performance improvement?

A. That was not reflected in my own -- I don't believe – I believe my review was still generally effective at that point in time that year.

Q. Tell me every time Ron Kleck and Joe Dauven were not penalized for their performance to not submit nightly reports?

A. I don't believe they were penalized.

Q. What evidence do you have to support your contention in your complaint that Ron Kleck and Joe Dauven did not submit timely

nightly reports?

A. You're leaving out Greg Siosin.

Q. We can talk about Greg. Let's first talk about Ron Kleck and Joe Dauven.

A. I cannot produce any documents at this time.

Q. Okay. And did you say Greg Siosin?

A. Yes.

Q. Could you spell that last name please?

A. S-i-o-s-i-n.

Q. And what evidence do you have -- and -- strike that.

     Who is Greg Siosin?

A. Greg Siosin was placed under Jim Derby and I believe reported to him ore directly than Joe Dauven did at one point in time.

Q. Was he a co-worker of yours?

A. Yes.

Q. And what evidence do you have that Greg Siosin wasn't penalized for failure to submit nightly reports?

A. He told me so.

Q. Do you have any documentation evidence for this?

A. No.

Q. So did Greg Siosin tell you that he did not submit nightly reports, is that your testimony?

A. Yes.

Q. When did he tell you that?

A. I couldn't say specifically. I'm not sure.

Q. Can you identify any fact at all to support your claim of sex discrimination?

A. I do not have the performance review nor do I have the salary documentation. So without those, it's very difficult to demonstrate.

Q. Well, we gave you Ron Kleck's personnel file and I can double check it. The names are escaping me, but we gave you Ron Kleck's personnel file, we gave you other employees files as well.

A. You did not give them to me personally. You gave them to my lawyer who represents me.

Q. Okay. That's none of my business. But apart from these documents that you think are going to support your claims, other than these documents, you have no support for your sex discrimination claims, do you?
[Objection from Isbell's attorney]

Q. And you have no proof or evidence to support these claims though, right?

A. I can't produce documentation at this time.

[Non-relevant questions and answers not cited herein, but available in Isbell's deposition transcript]

Q. Tell me other male -- tell me the names of male employees in the engineering department who were granted ADA accommodations.

A. Those are supposed to be kept strictly confidential, so I cannot tell you.

Q. But one of your claims is that there were male employees that were granted ADA accommodations and that you somehow weren't, so I want to know who.

A. Are we talking about gender discrimination?

Q. Yes.

A. They were given health related considerations, and that was Ron Kleck.

Q. But does that mean he received an ADA accommodation?

A. I do not know the form of the accommodation or whether he even had to request one as I did.

Q. Okay. Tell me every reason why your job performance was as good, if not better, than Ron Kleck's.

A. I believe that I more adequately actually helped my internal customers than Ron Kleck did, however, I do not believe that the reviews reflected it.

Q. Do you have any – strike that.

Can you cite to any documents or direct me to any document that supports your claim that your job performance was as good, if not better than Ron Kleck?

A. No. I believe Ron Kleck was given better performance reviews that I did, but I do not have that document nor have I read it.

Q. Okay. Now tell me every reason why your job performance was as good, if not better than Joe Dauven's?

A. Joe was on there a brief time. I trained him on many of the instruments. I believe it was -- my performance was as good as his but I don't have the performance reviews or have not seen them to prove that he was given as good as or better performance reviews as I was.

Q. Okay. Do you think Ron Kleck should have been discharged for his performance issues or attendance violations or for any other reasons?

A. No, but I don't think I should have been discharged either.

Q. Do you think Joe Dauven should have been discharged for any reason?

A. Definitely not Joe.

(Isbell Dep. pp. 364-373).

**ANSWER**:    Objection, DSSOF No. 96 does not contain any statement of cited fact.  It is pure legal argument.  JCI improperly attempts to argue the merits of its Memorandum in its SSOF paragraph 96.  Without waiving said objection, ISBELL disputes the "facts" alleged in DSSOF No.

96.    The record reflects that certain male employees were systematically treated better than ISBELL during the course of her employment.    At all relevant times Derby only supervised 3 full time employees, ISBELL, Ron Kleck ("Kleck") and Greg Siosin; ISBELL was the only female employee supervised by Derby and only ISBELL and Kleck were engineers.[49]    Derby admitted that when Kleck was out of work for 4-5 weeks pursuant to the Family Medical Leave Act, arrangements were made by JCI to outsource all of his job duties.[50]    Further, like ISBELL's job duties, Kleck's job duties included customer service[51] – the critical reason JCI claims allowing ISBELL to start at 10:00 a.m. would cause undue hardship.    At all relevant times, Kleck was the only Metallurgical Engineer employed by JCI.    Likewise, during all relevant times, ISBELL was the only Chemical Engineer employed by JCI.[52]    Derby did not object to outsourcing all of Kleck's job duties to an independent laboratory, yet was "personally against" outsourcing some of ISBELL's job duties to allow ISBELL a 10:00 a.m. start time.[53]    Certainly an inference can be made that ISBELL was treated differently than male employees at JCI as a result of her sex.

In addition, the record reflects that JCI allowed certain male employees flexible work schedules or other schedule accommodations for various reasons yet denied ISBELL's medically supported ADA accommodation request.    Specifically, Baseem Ranhal's was allowed to start work at 9:00 a.m., 30 minutes after the "mandatory" 8:30 a.m. start time implemented by Wasser, while ISBELL was required to start her work day at 8:30 a.m. (after JCI unilaterally revoked her previous accommodation).[54]    And, another male employee, Robert Eicksteadt, was

---

[49] See Exhibit 2, at pg. 25-27; pg. 56, lines 23-24, pg. 57-58.
[50] See Exhibit 2, at pg. 84, lines 4-24, pg. 85, lines 1-24, pg. 86, lines 1-2.
[51] See Exhibit 2, at pg. 55, lines 7-9.
[52] See Exhibit 2, at pg. 24, lines 21-24, pg. 25, lines 11-15, 16-20.
[53] See Exhibit 2, at pg. 84, lines 20-24, pg. 85, lines 6-17.
[54] See Deposition of James Wasser, at pg. 108, lines 8-19, pg. 114, lines 8-10, true and correct copies of relevant portions which are attached hereto and incorporated herein by reference as Exhibit 3.

allowed a reasonable accommodation in the form of working from home. In addition, ISBELL was often required to perform job duties outside of her job description and was never compensated for said extra duties.[55] Finally, after ISBELL was terminated JCI hired various male employees to either fill her job position or take over her job duties. The record reflects that John Hornick, Samuel Margolis and Fernando Gomez, all male employees, performed ISBELL's job duties after she was terminated.[56] Clearly the evidence reflects that similarly situated male employees were treated differently than ISBELL.

## ISBELL'S ADDITIONAL CONTRAVENING STATEMENT OF FACTS IN OPPOSITION TO JCI'S MOTION FOR SUMMARY JUDGMENT

1.  JCI does not have a written policy regarding reasonable accommodation requests pursuant to the ADA and nowhere in the employee handbook does it require an employee submit a written request for a reasonable accommodation.[57]

2.  JCI's Employee Handbook dictates that employees shall work 8 hours a day, 5 days a week (a 40 hour week).[58]

3.  PMI analyses were part of a testing service which, as a whole, took up about 25% of ISBELL's job duties.[59]

4.  ISBELL was often required to perform job duties outside of her job description and was never compensated for said extra duties.[60]

5.  At all relevant times Derby only supervised 3 full time employees, ISBELL, Ron Kleck ("Kleck") and Greg Siosin; ISBELL was the only female employee supervised by Derby and only ISBELL and Kleck were engineers.[61]

---

[55] See Exhibit 2, at pg. 168, lines 14-16.
[56] See Exhibit 2, at pg. 181, lines 15-24, pg. 182, lines 1-3, pg. 183, lines 1-24, pg. 184, lines 1-11.
[57] See Exhibit 1, at pg. 37, lines 13-16.
[58] See JCI000903, attached hereto and incorporated herein by reference as Exhibit 4.
[59] See Dkt.#52, at ¶44; see also Exhibit 2, at pg. 196, lines 21-24, pg. 197, lines 1-3.
[60] See Exhibit 2, at pg. 168, lines 14-16, pg. 178, lines 19-23.

6.        There was some overlap between Kleck's and ISBELL's job duties.[62]

7.        At all relevant times, Kleck was the only Metallurgical Engineer employed by JCI; likewise, during all relevant times, ISBELL was the only Chemical Engineer employed by JCI.[63]

8.        JCI had previously outsourced some of ISBELL's job duties and other JCI employees were capable of and did perform some of ISBELL's positive material identifications;[64] when ISBELL was out on FMLA in 2008, JCI assigned other employees to complete material conformance tests when ISBELL was out on FMLA, including, inter alia, Joe Dauven, Ron Kleck, and some application engineers.[65]

9.        Upon request by Derby or another supervisor, Rohit Thakur assisted ISBELL with conducting PMIs during a time period when ISBELL had over 400 PMIs a month to perform – it is more typical to have about 200 PMIs to perform.[66]

10.      When Kleck was out of work for 4-5 weeks pursuant to the Family Medical Leave Act, arrangements were made by JCI to outsource all of his job duties;[67] and, like ISBELL's job duties, Kleck's job duties included customer service.[68]

11.      Derby did not object to outsourcing all of Kleck's job duties to an independent laboratory, yet was "personally against" outsourcing some of ISBELL's job duties to allow ISBELL a 10:00 a.m. start time.[69]

[61] See Exhibit 2, at pg. 25-27; pg. 56, lines 23-24, pg. 57-58.
[62] See Exhibit 2, at pg. 25-27; pg. 56, lines 23-24, pg. 57-58.
[63] See Exhibit 2, at pg. 24, lines 21-24, pg. 25, lines 11-15, 16-20.
[64] See Exhibit 2, at pg. 85, lines 6-17.
[65] See Exhibit 2, at pg. 78, lines 20-24, pg. 79, lines 1-24, pg. 80, line 1.
[66] See Exhibit 2, at pg. 76, lines 20-24, pg. 77 lines 1-24.
[67] See Exhibit 2, at pg. 84, lines 4-24, pg. 85, lines 1-24, pg. 86, lines 1-2.
[68] See Exhibit 2, at pg. 55, lines 7-9.
[69] See Exhibit 2, at pg. 84, lines 20-24, pg. 85, lines 6-17.

12.    JCI allowed certain male employees flexible work schedules or other schedule accommodations for various reasons; specifically, Baseem Ranhal's was allowed to start work at 9:00 a.m., 30 minutes after the alleged "mandatory" 8:30 a.m. start time implemented by Wasser, while ISBELL was required to start her work day at 8:30 a.m. (after JCI unilaterally revoked her previous accommodation).[70]

13.    Robert Eicksteadt, was allowed a reasonable accommodation in the form of working from home and upon his return to work he was assisted by security in accessing his work area because he required crutches in order to walk.[71]

14.    ISBELL was often required to perform job duties outside of her job description and was never compensated for said extra duties.[72]

15.    JCI managers and/or supervisors are required to document complaints regarding an employee's job performance and store said complaint in an employees personnel file; Managers and/or supervisors are further required to investigate all complaints regarding employee job performance.[73]  Thereafter, the decision regarding the investigation is required to be placed in the employee's personnel file.[74]

16.    If a supervisor and/or manager does not document a complaint about an employee's job performance, "…it didn't happen."[75]

17.    After ISBELL was terminated JCI hired various male employees to either fill her job position or take over her job duties.   John Hornick, Samuel Margolis and Fernando Gomez, all male employees, performed ISBELL's job duties after she was terminated.[76]

---

[70] See Exhibit 3, at pg. 108, lines 8-19, pg. 114, lines 8-10.
[71] See Dkt.# 52, at Exhibit H, ¶16.
[72] See Exhibit 2, at pg. 168, lines 14-16.
[73] See Exhibit 1, at pg. 35, line 24, pg. 36, lines 1-24, pg. 37, lines 1-10.
[74] See Exhibit 1, at pg. 36, lines 11-18.
[75] See Exhibit 1, at pg. 37, lines 1-10.
[76] See Exhibit 2, at pg. 181, lines 15-24, pg. 182, lines 1-3, pg. 183, lines 1-24, pg. 184, lines 1-11.

18. During the 8 month period from December 29, 2008 through August 26, 2009, ISBELL arrived to work after 10:00 a.m. <u>only 3 times</u> – which would *<u>not have put</u>* ISBELL in violation of the attendance policy (without the grace period) had ISBELL been given a 10:00 a.m. start time; had ISBELL even been granted a 9:30 a.m. start time (with the grace period) during that same period ISBELL would not have accumulated enough points for termination pursuant to the JCI attendance policy.[77]

Respectfully submitted,

**ANNA B. ISBELL**

By:    **/s/ Marissa B. Saltzman**
               One of her Attorneys

Spencer J. Marks, Esq. (1769928)
Jonathan D. Rosen, Esq. (6287905)
Marissa B. Saltzman, Esq. (6293683)
**POKORNY & MARKS, LLC**
6 West Hubbard, Suite 700
Chicago, Illinois 60654
(312) 540-0600

---

[77] See Dkt.# 52, at ¶98, at Exhibit BB; see also Dkt.# 52, at ¶97, at Exhibit NN; see also Exhibit 2, at pg. 137, lines 1-13, pg. 138, lines 12-14, pg. 139, lines 1-4.