**IN THIS UNITED STATES DISTRICT COURT FOR THE
NORTHERN DISTRICT OF ILLINOIS, EASTERN DIVISION**

| | | |
|---|---|---|
| **ANNA B. ISBELL,** | } | |
| | } | |
| **Plaintiff,** | } | **Civil Action** |
| | } | |
| **v.** | } | **Case No. 11 cv 02347** |
| | } | |
| **JOHN CRANE, INC.,** | } | **Judge Milton I. Shadur** |
| | } | |
| | } | |
| **Defendant.** | } | |

**PLAINTIFF ANNA B. ISBELL'S RESPONSE IN OPPOSITION TO DEFENDANT
JOHN CRANE, INC.'S MOTION FOR SUMMARY JUDGMENT**

Plaintiff, Anna B. Isbell ("ISBELL"), by and through counsel, POKORNY & MARKS, LLC, hereby files her Response in Opposition to Defendant John Crane, Inc.'s ("JCI") Motion for Summary Judgment ("Response"). As discussion will show, JCI's Motion for Summary Judgment must be summarily denied *in toto* for the foregoing reasons:

(1) JCI cannot prove as a matter of law that it reasonably accommodated ISBELL's request for a flexible work schedule (10:00 a.m. start time) pursuant to The Americans with Disabilities Act, 42 U.S.C. §12111 *et seq* ("ADA") because, (a) JCI failed to engaged in an interactive process with ISBELL with regard to her request for a reasonable accommodation as required by the ADA, and (b) JCI failed to establish as a matter of law that allowing ISBELL the requested 10:00 a.m. start time would cause undue hardship to JCI.

(2) JCI cannot prove as a matter of law that it did not retaliate against ISBELL on and after she filed her April 15, 2009 charge of discrimination against JCI with the Equal Employment Opportunity Commission ("EEOC"). The facts are undisputed that JCI created a very hostile working environment for ISBELL after she filed her April 15, 2009 EEOC charge for denying her ADA accommodation request by (a) requiring ISBELL submit numerous and redundant documents from her various physicians for clarification on her current medical condition and medical need for a 10:00 a.m. start time, without ever having the medical documentation reviewed by anyone with medical knowledge whatsoever, and (b) threatening to revoke the temporary "accommodation." Perhaps even more compelling evidence of JCI's retaliation against ISBELL was JCI's request that ISBELL submit to an Independent Medical Examination ("IME") in contradiction with Crane's own policy criteria for when it would request an employee submit to an IME; and, when JCI received its own IME

report, intentionally ignored it because it agreed with ISBELL's treating physician. Not to mention during all of its alleged investigation, JCI continued to assess attendance penalty points against ISBELL for "violating" the same attendance policy for which ISBELL was seeking a minor modification as an ADA accommodation.

(3) JCI cannot prove as a matter of law that it terminated ISBELL for a legitimate non-discriminatory business reason merely 6 weeks after she filed her second EEOC charge on July 14, 2009. The facts are undisputed that on and after July 14, 2009 (also the date ISBELL submitted to JCI's IME), JCI continued to assess attendance penalty points against ISBELL while it was waiting for its own IME report confirming ISBELL's medical necessity for a later start time. The record is also undisputed that even after JCI received its IME report confirming the medical need, JCI terminated ISBELL which was only 1 week after submitting JCI's response to ISBELL's July 14, 2009 charge to the EEOC and only 3 days after receiving its IME report.

(4) JCI cannot prove as a matter of law that it did not discriminate against ISBELL based on her sex. A genuine issue of fact exists as to whether or not JCI treated ISBELL differently because of her sex. The evidence reflects that certain JCI male employees were granted flexible work schedule accommodations for reasons other than medical. In addition, the record reflects that after ISBELL was terminated, JCI hired and/or transferred only male employees to fill ISBELL's job duties. These facts raise a clear and convincing inference that her termination was pretextual.

ISBELL's Response is supported by the following Memorandum of Points and Authorities, ISBELL's Response to John Crane, Inc.'s ("JCI") Statement of Undisputed Material Facts in Support of its Motion for Summary Judgment and Additional Statement of Facts in Opposition to Defendant's Motion of Summary Judgment ("RDSSOF"), ISBELL's Motion for Summary Partial Summary Judgment and Supporting Memorandum ("MSJ") filed on August 21, 2013 (Dkt.#53 and #55), ISBELL's Separate Statement of Facts ("SSOF") filed on August 21, 2013 (Dkt.#52) and the entire record in this matter.

## MEMORANDUM OF POINTS AND AUTHORITIES

**A.     JCI Cannot Prove as a Matter of Law that it Reasonably Accommodated ISBELL's Disability Pursuant to the Requirements as Set Forth Under the ADA and IHRA.**

JCI makes the unsupported and inaccurate assertion that it is entitled to judgment as a matter of law because (a) ISBELL is not a "qualified individual" under the ADA or IHRA

because she could not perform the essential functions of her job with or without a reasonable accommodation, (b) JCI did provide ISBELL with a reasonable accommodation, and (c) a 10:00 a.m. start time was unreasonable because it would have caused an undue hardship to JCI. Contrary to these assertions, the record is rife with supported evidence rebutting every single aspect of JCI's assertions and thus, JCI is not entitled to judgment as a matter of law on ISBELL's failure to reasonably accommodate claims pursuant to the ADA and IHRA.

### i. *ISBELL is a "Qualified Individual" Under the ADA and IHRA.*

JCI does not dispute that ISBELL was "disabled" under either the ADA or IHRA; however, claims that ISBELL was not considered a "qualified individual" for purposes of the ADA and IHRA. The ADA defines a "***qualified*** individual with a disability" as "an individual with a disability who, with or without reasonable accommodation, can perform the essential functions of the employment position that such individual holds or desires." 42 U.S.C. § 12111(8). The ADA allows that consideration be given to the employer's judgment as to what functions of a job are essential. Jackson v. City of Chicago, 414 F.3d 806, 811 (7th Cir. 2005). However, the ADA does not state that in order to be considered a "qualified individual", an individual must prove his or her ability to perform *all* of the functions of the job. Deane v. Pocono Med. Ctr., 142 F.3d 138, 146-147 (3rd Cir. 1998) (if the individual can perform the essential functions of the job without accommodation ***as to those functions,*** regardless of whether the individual can perform the other functions of the job (with or without accommodation), that individual *is* qualified under the ADA. Moreover, "if an employer has prepared a written description . . ., this description shall be considered evidence of the essential functions of the job." Jackson, 414 F.3d at 811, citing, 42 U.S.C. § 12111(8).

The IHRA considers a condition "unrelated to a person's ability to perform the duties of a particular job or position if it merely affects the person's ability to perform tasks or engage in activities that are apart from or only incidental to the job in question." See 775 ILCS 5/1-103(I)(1) (2013); see also 56 Ill. Adm. Code §2500.20 (2013). Moreover, "[i]rrelevant implications include the preferences of co-workers, clients and customers." Id.

JCI nonsensically claims the "pivotal" issue here is "whether performing her *time sensitive* parts testing duties before 10:00 a.m. was an essential function of ISBELL's job." (See Dkt.#58, at pg. 12.) JCI references a long list of hypothetical situations that could have occurred; however, the record does not reflect any actual instances where ISBELL's failure to perform a PMI prior to 10:00 a.m. resulted in any actual harm whatsoever to JCI; because, it never happened. Moreover, JCI asserts that ISBELL's perception that providing services to internal customers was an *important* part of her job does not mean that it is an "essential" function of her job; nor does it mean that that particular function was required to be performed at a certain time in the morning.

JCI admits it prepared a written description of ISBELL's job duties as Chemical Engineer I.[1] The job description does not indicate any specific time frame for ISBELL to complete her work, nor does it require ISBELL submit her projects by a specific time of day. Further, JCI does not claim that ISBELL was unable to perform any of those duties listed on the job description, only that she was unable to perform certain testing at a "preferred" time of the day.[2] The law is clear that preferences of co-workers, clients and customers are irrelevant implications;

---

[1] See Dkt.#52, at ¶7.
[2] JCI asserts that ISBELL was unable to perform the essential functions of her job because customers being serviced by ISBELL's position were not being serviced in a timely fashion due to her modified work schedule. However, Jim Derby ("Derby") testified that the "requirement" for completion of positive material identification analyses by a certain time in the morning was only a "preferred time," not essential time. See Dkt.#52, at ¶¶43, 44, 45. In addition, a small portion of ISBELL's job duties included servicing field engineers located all over the country and throughout Canada – different time zones. See Dkt.#52, at ¶46. Therefore, a request could come in at any time of day – not just prior to 10:00 a.m.

thus, Derby's preference that PMI analyses be completed at a certain time in the morning is irrelevant – not to mention JCI has not and cannot produce any written policy or procedure given to ISBELL requiring ISBELL complete any task at a certain time in the day. In addition, those "emergency situations" JCI now asserts as being critical to ISBELL's job function fail to take into account those times where ISBELL is absent from work due to illness, vacation or other allowed personal reasons. In fact, JCI had in place a system where those issues are addressed, including, *inter alia*, employees who could perform tests in ISBELL's absence.[3]

All of the relevant and supported facts are undisputed that ISBELL was able to perform and did perform each and every job duty listed on her job description, as required, in addition to other job duties assigned her at the discretion of her supervisor, Derby.[4] Even more compelling, Derby testified that he "was pleased with A.J. as an Engineer…[w]hen she worked on a project I was satisfied…she did a good job."[5] *Ipso facto*, during the time JCI allowed ISBELL the accommodation of a 10:00 a.m. start time, and even the 9:15 a.m. temporary start time, ISBELL did a "good job." JCI cannot point to one single shred of evidence (outside of hypothetical scenarios created for this case that never actually occurred) that ISBELL was actually or physically unable to perform her essential job duties because of her disability.

    ii.    *ISBELL's Occasional Tardiness is Irrelevant to Whether She is a "Qualified Individual" Under the ADA and IHRA*

JCI makes the ridiculous assertion that because ISBELL was tardy to work she is not a "qualified individual" under the ADA and IHRA. First, and most importantly, JCI has failed to produce any attendance records for ISBELL earlier than December 29, 2008.[6] Nor did JCI

---

[3] See ISBELL's Additional Statements of Fact contained in her Response to JCI's 56.1 Statement of Facts ("RDSSOF"), at ¶¶8, 9.
[4] See Dkt.#52, at ¶10.
[5] See Dkt.#52, at ¶10; see also Exhibit C to Dkt.#52 at pg. 63, lines 10-13.
[6] See Dkt.#52, Exhibit BB.

produce any evidence of written warnings or disciplinary actions taken against ISBELL for any alleged attendance violations prior to 2009. As such, this Court must not consider any alleged attendance "violations" other than those occurring on and after December 28, 2009 and during the time ISBELL sought her reasonable accommodation of a 10:00 a.m. start time – which was unilaterally revoked on October 7, 2008.

Second, the case law cited by JCI in support of its assertion that ISBELL is not a "qualified individual" is wholly distinguishable from the facts here and therefore inapplicable. In EEOC v. Yellow Freight System, Inc., 253 F. 3d 943 (7th Cir. 2001), the plaintiff sought a reasonable accommodation from his employer specifically stating by letter, "no particular considerations at this time other than the resources necessary to perform my job and reasonable accommodations necessary to monitor and maintain my health status, which would include sick days, if needed[,] without being penalized." The Seventh Circuit held that an unreasonable demand for unlimited time off was not within the scope of protection afforded by the ADA. Id. at 951. Here, ISBELL was not an erratically absent employee nor was she seeking an unlimited amount of time off as a reasonable accommodation under the ADA. While ISBELL does not dispute that she was sometimes tardy to work only after JCI unilaterally and suddenly revoked her 10:00 a.m. start time in October 2008, her reasonable accommodation re-request was specific, definite and temporary (until her medication could be properly adjusted) and, therefore not unreasonable or unlimited so as to prevent her from being "qualified" under the ADA and IHRA.

Similarly, unlike the plaintiffs in Amadio and Waggoner, cited by JCI, ISBELL was not seeking an open ended work schedule or one allowing her to miss work whenever she needed for so long as she felt she needed. See Waggoner v. Olin Corp., 169 F. 3d 481, 485 (7th Cir. 1999);

see also Amadio v. Ford Motor Corp., 238 F. 3d 919 (7th Cir. 2001).  Nor had ISBELL accumulated anywhere near the number of absences as those plaintiffs in Waggoner (employee missing 5 months of work, and showing up late or not at all for forty days in a fourteen-month period) and Amadio (23 medical leaves in 3 years totaling about 18 months).  Under JCI's attendance policy, over an 8 month period, ISBELL was an average of only 8 minutes tardy about 25 times and had no unexcused absences; however, JCI counted ISBELL tardy at all times (1) during its alleged investigation of ISBELL's reasonable accommodation request for a 10:00 a.m. start time, (2) during the time JCI requested ISBELL submit to an IME, and (3) during the time JCI was waiting for its own IME report which confirmed ISBELL's medical need for a 10:00 a.m. start time.[7]  Moreover, had JCI not arbitrarily revoked ISBELL's prior accommodation of a 10:00 a.m. start time in October 2008, with the 30 minute grace period allowed by JCI without penalty, ISBELL would have never been tardy to work.[8]  ISBELL's tardiness based on her temporary inability to arrive to work at 9:15 a.m. instead of her requested 10:00 a.m. as a result of a diagnosed medical condition is beyond the scope of the Seventh's Circuit's holding in Waggoner or any other case cited by JCI.  As such, ISBELL's occasional tardiness, caused by JCI's revocation of her previous accommodation and failure to fully reinstate it despite supporting medical documentation, did not prevent her from being "qualified" under the ADA and IRHA.

          iii.    *ISBELL Did Establish That a 10:00 a.m. Start Time was Medically Necessary.*

Incredibly, JCI argues that ISBELL failed to establish that her requested 10:00 a.m. start time was "medically necessary" and instead opines, without support, that her requested start time

---

[7] See Dkt.#52, at ¶98, at Exhibit BB; see also Dkt.# 52, at ¶97, at Exhibit NN.
[8] Id.

was merely a "personal convenience."[9]  This assertion is wholly disputed by the voluminous record of every medical provider involved in this case.  Dr. Deepak Kapoor specifically stated in his response to JCI's medical questionnaire that the accommodation required for ISBELL would be to start her work day at 10:00 a.m. as her medications for ADD and Bipolar do not kick in until then.[10]  When asked why ISBELL could not take her medications earlier, Dr. Kapoor responded that due to her condition, she has trouble waking up and cannot take said medications earlier.[11]  Dr. Kapoor also stated in the various medical documentation provided to JCI that ISBELL suffers from a delayed sleep cycle and testified in his deposition that as a result of her delayed sleep cycle and circadian rhythm, it would not be an ideal situation for ISBELL to wake up earlier than she was.[12]  Most compelling is that JCI's own IME, Dr. David Hartman's IME report specifically stated that he agreed with Dr. Kapoor's statement that ISBELL has a "credible psychological justification for starting work somewhat later."  Dr. David Hartman (JCI's own IME) even referred ISBELL to Dr. Carl Wahlstrom to help ISBELL better balance her medications – whom ISBELL continues to be treated by even today.[13]

More glaring are the undisputed and admitted facts that not a single JCI employee involved in the *medical* investigation and decision denying ISBELL's 10:00 a.m. requested accommodation (Tony Caballero, Walt Burdorf, Derby and Jim Wasser) have any medical background, training or knowledge whatsoever, and therefore had no <u>medical ability</u> to doubt the medical representations of any of ISBELL's physicians, including JCI's own IME.[14]  Further, those same JCI employees admitted that they never consulted with Dr. Deepak Kapoor or Dr.

---

[9] See Dkt.#58, at pg. 16.
[10] See Dkt.#52, at ¶¶39 (Exhibit O), 72 (Exhibit DD), 77 (Exhibit EE).
[11] <u>Id</u>.
[12] <u>Id</u>.; see also Dkt.# 60, at Exhibit Q, p. 29-30.
[13] See Dkt.#52, at ¶92, at Exhibit II, pg. 7.
[14] See Dkt.#52, at ¶48.

Eric Gall regarding their responses to JCI's requested medical assessments, nor did any of those JCI employees consult with a company doctor or any other individual with medical knowledge regarding the submitted medical assessments.[15] The only "convenience" involved in this case is JCI's unsupported after-acquired assertion that ISBELL's request for an accommodation pursuant to the ADA was a mere "personal convenience." JCI's assertion that ISBELL did not establish a 10:00 a.m. start time was medically necessary is completely false and unsupported by the entire record in this case.

iv.    <em>JCI Did Not Provide ISBELL With A Reasonable Accommodation</em>

The duty of reasonable accommodation is satisfied when the employer does what is necessary to enable the disabled worker to work in reasonable comfort." <u>EEOC v. Sears, Roebuck & Co.</u>, 417 F.3d 789, 803 (7th Cir. 2005), quoting <u>Vande Zande v. Wis. Dep't of Admin.</u>, 44 F.3d 538, 546 (7th Cir. 1995). "An *ineffective* 'modification' or 'adjustment' will not *accommodate* a disabled individual's limitations." <u>US Airways, Inc. v. Barnett</u>, 535 U.S. 391, 400 (2002). While the law does not require the employer provide the employee with the particular accommodation she requests, "[t]he ADA obligates the employer to engage with the employee in an interactive process to determine the appropriate accommodation under the circumstances." <u>Sears</u>, 417 F.3d. at 805, quoting <u>Gile v. United Airlines, Inc.</u>, 213 F.3d 365, 373 (7th Cir. 2000). This process "imposes a duty upon employers to engage in a flexible, interactive process with the disabled employee needing accommodation so that, together, they might identify the employee's precise limitations and discuss accommodation which might enable the employee to continue working." See <u>Gile</u>, 213 F.3d at 373; see also <u>Cloe v. City of Indianapolis</u>, 712 F.3d 1171, 1176 (7th Cir. 2013) (interactive process found where "once the City found out

---

[15] See Dkt.# 52, at ¶¶53, 68, 73.

that its proposed accommodations were insufficient, it acted with reasonable speed to come up with new ones."

Here, not only is it undisputed that ISBELL's 10:00 a.m. start time accommodation was suddenly and unilaterally revoked, but it is further undisputed that once ISBELL again advised JCI of her need for a 10:00 a.m. start time, JCI failed to engage in <u>any</u> interactive process with ISBELL, her physicians, or any other medical provider to meet her needs or even find an alternative.[16] The record reflects that the only time JCI involved ISBELL in the accommodation process was a single email from Tony Caballero, JCI Human Resources Generalist ("Caballero"), asking that ISBELL "provide him her desired start time" to which ISBELL responded "between 10:00 and 10:30 a.m." [17] After that, JCI did not consult with ISBELL prior to issuing its decision to allow her an arbitrary chosen 9:15 a.m. start time – nor did JCI consult with any medical provider or any individual with any medical knowledge whatsoever regarding any of the medical documentation JCI required ISBELL to submit, including ISBELL's own physicians or even JCI's own IME.[18] JCI arbitrarily and unilaterally chose a temporary start time of 9:15 a.m. without providing ISBELL any alternatives and then falsely told ISBELL she could not appeal that decision.[19] Even when ISBELL told JCI that the temporary 9:15 a.m. start time was not allowing her to function properly, as evidenced by her attendance record and Derby's own perception that when ISBELL came in before 10:00 a.m., she didn't seem as "attentive", JCI completely ignored ISBELL's pleas and Derby's observations.[20] In accordance with the Seventh Circuit's holding in <u>Cloe</u>, by failing to (1) fully engage with ISBELL in a discussion regarding her need for a 10:00 a.m. start time, and (2) offer ISBELL any alternatives to the 9:15

---

[16] See Dkt.#52, at ¶¶29, 52, 53, 68, 69, 73.
[17] See Dkt.#52, at ¶52.
[18] See Dkt.#52, at ¶¶48, 49, 51, 52, 67, 68, 69.
[19] See Dkt.#52, at ¶¶29, 41, 55.
[20] See Dkt.#52, at ¶¶37, 56.

a.m. start time despite ISBELL's repeated statements that she was having trouble arriving to work on time due to her verified medical conditions, JCI completely failed to engage in any interactive process, a clear and absolute violation of the ADA and supporting case law.  See Cloe, 712 F.3d at 1176; Sears, 417 F.3d. at 805; see also Gile, 213 F.3d at 373.

> v.    *A 10:00 a.m. Start Time Was Not Unreasonable and Would Not Cause Undue Hardship on Crane.*

"An accommodation is reasonable if it is both efficacious and proportional to the costs to implement it."  Oconomowoc Residential Programs v. City of Milwaukee, 300 F.3d 775, 784 (7th Cir. 2002).  "An accommodation is unreasonable if it imposes undue financial or administrative burdens or requires a fundamental alteration in the nature of the program."  Id.  The record only supports ISBELL's position that an accommodation of a 10:00 a.m. start time as opposed to a 9:15 a.m. start time was not unreasonable and would not pose an undue hardship on JCI.

The record and JCI's handbook is clear that JCI's technology department employees (which included ISBELL) were entitled to a 30-minute grace period; and the guidelines do not place a limit on use of the 30-minute grace period.[21]  Even Walt Burdorf specifically stated that with the temporary 9:15 a.m. start time, ISBELL would not accumulate points under the JCI attendance policy until after 9:45 a.m.[22]  In light of the 30-minute grace period ISBELL was asking for a mere 15 minute adjustment of the 9:15 a.m. start time.  Allowing ISBELL even a 9:30 a.m. start time would have allowed her to arrive at work by 10:00 a.m. and, so long as she made that time up in the same work week, she would not have been assessed attendance penalty points.  Moreover, ISBELL's attendance records (recorded by DERBY and authenticated during his deposition) reflect that during the 8 month period from December 29, 2008 through August

---

[21] See Dkt.#52, at ¶¶11, 12, 13.
[22] See Dkt.#52, at ¶13.

26, 2009, ISBELL arrived to work after 10:00 a.m. only 3 times –which (without the grace period) would *not have put* ISBELL in violation of the attendance policy; had ISBELL been allowed even a 9:30 a.m. start time (with the grace period) she also would not have accumulated enough points for termination pursuant to JCI's attendance policy[23]   It is axiomatic that an additional 15 minutes of time would have been more efficacious to accommodate ISBELL and the cost to implement it would have been no different than the arbitrary 9:15 a.m. temporary start time provided ISBELL.

Notwithstanding that a mere 15 minutes of extra time would have prevented the accumulation of attendance points and, thus, ISBELL's wrongful termination, JCI cannot prove that a 10:00 a.m. start time or even 9:30 a.m. start time (with the 30 minute grace period) would have caused undue hardship on JCI.  As an initial observation, JCI has not supported the record with any evidence that a 10:00 a.m. start time versus a 9:15 a.m. start time would or did create an added cost to JCI.  Further, JCI asserts after-acquired justifications and hypothetical scenarios attempting to articulate why it refused ISBELL the accommodation she requested – all of which are unsupported and actually contrary to the evidence in the record.

JCI claims that allowing ISBELL to start at 10:00 a.m. would effect the distribution of work between Derby and Ron Kleck (Metallurgical Engineer) ("Kleck").   However, Derby testified that he, as supervisor, has the authority to manage and change the day to day job activities for employees he supervises and that there was some overlap between Kleck's and ISBELL's job duties.[24]  Derby further testified that JCI made arrangements when Kleck was out on medical leave to have *all* of his job tasks outsourced; however, he was *personally against* outsourcing only 45 minutes of ISBELL's duties (between 9:15 a.m. and 10:00 a.m.) if the need

---

[23] See Dkt.#52, at ¶98, at Exhibit BB; see also Dkt.# 52, at ¶97, at Exhibit NN; see also RDSSOF, at ¶18
[24] See Dkt.#52, at ¶9; see also RDSSOF, at ¶6.

actually arose.[25]   In addition, the record reflects that other JCI employees were capable of assisting ISBELL in performing positive material identifications ("PMIs") and did the same. Upon request, Rohit Thakur assisted ISBELL with conducting PMIs during a time period when ISBELL had over 400 PMIs a month to perform – its more typical to have about 200 PMIs to perform.[26]   And, in 2008, when ISBELL was on medical leave, JCI assigned other employees to complete material conformance tests during ISBELL's absence including, *inter alia*, Joe Dauven, Ron Kleck, and some application engineers.[27]   It is axiomatic that JCI had the ability to redistribute job tasks between its employees (and at times did) and/or outsource job tasks as it did for Ron Kleck *when it chose to or the need arose*.  A simple redistribution of a few tasks would have enabled PMIs to be completed earlier than 10:00 a.m. and would also have provided ISBELL an effective accommodation.

JCI next contends that allowing ISBELL a 10:00 a.m. start time would cause an undue hardship because ISBELL's "early morning parts testing duties and service to her internal customers were essential functions of her job."  In addition to the fact that JCI could have easily redistributed and/or outsourced certain of ISBELL's job tasks (including PMIs), PMIs needed to be completed with enough time to get to the loading JCI loading dock to ship overnight to the customer.[28]   Contrary to JCI's assertions, the record reflects that PMI analyses were part of a testing service which, as a whole, took up only 25% of ISBELL's job duties.[29]   PMI analyses take about 30 minutes to complete and had to be completed with enough time to get to the loading dock for the carrier to ship overnight.[30]   Again, Derby testified that the request that PMI

---

[25] See RDSSOF, at ¶¶10, 11.
[26] See RDSSOF, at ¶9.
[27] See RDSSOF, at ¶8.
[28] See Dkt.#52, at ¶45.
[29] See Dkt.#52, at ¶44; see also RDSSOF, at ¶3.
[30] See Dkt.#52, at ¶44.

analyses be completed at a certain time in the morning was merely a "preferred" time and JCI has not produced any written policy or any job description requiring ISBELL complete any task at a certain time in the day.[31]  See 56 Ill. Adm. Code §2500.20 (2013) ("[i]rrelevant implications include the preferences of co-workers, clients and customers.")  Therefore, it is obvious that allowing ISBELL an additional 15 minutes of time in the morning could not possibly have caused any undue hardship in conducting PMI analyses or timely getting the results to the loading dock for shipment.

In this case, JCI asserts nothing more than after-acquired and self serving representations from its own employees (3 years later) to support its position that (1) internal customers "complained" to Wasser about problems with on-time delivery of JCI's products, and (2) that ISBELL's early morning absences caused delay and disruption to JCI's manufacturing process. Absent these new convenient affidavits, the record does not contain a single written complaint from any of ISBELL's internal customers supporting either assertion JCI alleges as proof of undue hardship.  For proof that these assertions are after-acquired fabrications, the Court need look no further than statements made by Walt Burdorf (Director of JCI's HR) who testified that if an internal employee complaint regarding job performance is not documented and stored in the employee's personnel file, then "*it didn't happen*."[32]  Therefore, according to JCI's executive in charge of all JCI employees, since ISBELL's personnel file does not contain a single timely written complaint from any of ISBELL's internal customers about ISBELL's alleged failure to deliver results "on-time", JCI's vague reference to internal customer complaints "*didn't happen*", and these new assertions cannot meet JCI's burden to show undue hardship.

---

[31] See Dkt.#52, at ¶45.
[32] See RDSSOF, at ¶¶15, 16.

What this case boils down to is 15 minutes of extra time JCI refused to allow ISBELL as a reasonable accommodation. It is compelling that allowing ISBELL those extra little 15 minutes could not have caused any "undue hardship" alleged by Crane. As these alleged hardships were never identified in writing to ISBELL at the time JCI denied ISBELL her 10:00 a.m. start time request, they are no more than after-acquired justifications by JCI in an attempt to avoid its own clear culpability.

Finally, perhaps the most compelling evidence of the absurdity of JCI's after-acquired alleged justifications and assertions of hypothetical undue hardships for denying ISBELL her requested and medically verified ADA accommodation for a 10:00 a.m. start time can be found by simply applying JCI's own Employee Handbook to JCI's new laboratory director Wasser's mandate to his managers that he wants the laboratory covered from 6:00 a.m. to "preferably" 6:00 p.m.[33] JCI's Employee Handbook dictates that employees shall work 8 hours a day, 5 days a week (a 40 hour week).[34] To achieve Wasser's mandate that the laboratory is to be staffed 12 hours per day, within the guidelines of JCI's Employee Handbook, at least one employee must start work at 6:00 a.m. and end at 2:00 p.m. (8 hours), and at least one employee must start work at 10:00 a.m. and end at 6:00 p.m. (8 hours). On the date of Wasser's mandate, ISBELL had an authorized medical accommodation that permitted her 8 hour work day to be from 10:00 a.m. to 6:00 p.m.[35]; and, Derby testified that ISBELL "did a good job" (it was only when she arrived earlier than 10:00 a.m. that she didn't seem as attentive as normal), and there were no recorded complaints at that time from her internal customers. ISBELL's 10:00 a.m. to 6:00 p.m. work day accommodation fit perfectly into Wasser's new mandate that the lab be covered to 6:00 p.m.

---

[33] See Dkt.#52, at ¶27.
[34] See RDSSOF, at ¶2.
[35] See Dkt.#52, at ¶¶24, 25.

JCI cannot have it both ways. Unless JCI mandated that some employees work from 9:00 a.m. to 6:00 p.m. forcing JCI to pay employees one hour overtime every work day, JCI needed an employee to work the lab from 10:00 a.m. to 6:00 p.m. JCI singled out ISBELL who already had a medical accommodation for a 10:00 a.m. start time and unilaterally revoked her medical accommodation start time which most conveniently fit into the very schedule Wasser then required. It is absurd for JCI to allege 3 years later that ISBELL's 10:00 a.m. start time was then an undue hardship when Wasser's new mandated laboratory hour coverage required a laboratory employee work the very same work schedule ISBELL already had an accommodation for, especially when at that time (according to her supervisor Derby) she was doing a good job , and had no written complaints. It is clearly evident in this case that JCI's hindsight has absolutely altered JCI's recollection of the facts in this case. With all due respect, JCI's Motion for Summary Judgment is entirely based on fabricated unsupported facts and contrary to all of the supported evidence and record in this case.

**B.      JCI Cannot Prove as a Matter of Law That it Did Not Retaliate Against ISBELL For Exercising Her Rights Under the ADA, Title VII and/or IHRA.**

*i.      ISBELL Can Prevail Under the Direct Method*

To establish a *prima facie* case of retaliation under Title VII and the IHRA, the plaintiff is required to show that: (1) she engaged in statutorily protected expression, (2) she suffered an adverse action by her employer, and (3) that there is a causal link between the protected expression and the adverse action. <u>Oates v. Discovery Zone</u>, 116 F.3d 1161, 1172 (7th Cir. 1997); see also <u>Hoffelt v. Ill. Dep't of Human Rights</u>, 367 Ill. App. 3d 628, 634, 867 N.E.2d 14, 19 (1st Dist. 2006). JCI does not dispute that ISBELL engaged in statutorily protected expression or that she suffered an adverse employment action. JCI solely contends ISBELL cannot establish the third element of a prima facie retaliation case – causation.

> a. *ISBELL has established a causal link between the protected expression and adverse action.*

To establish a causal link between protected activity and an adverse employment action, a plaintiff must demonstrate that the employer would not have taken the alleged adverse action "but for" the plaintiff's protected activity. <u>Rizzo v. Sheahan</u>, 266 F.3d 705, 715 (7th Cir. 2001). This may be done via direct evidence, which would "entail something akin to an admission by the employer." <u>Coleman v. Donahoe</u>, 667 F.3d 835, 860 (7th Cir. 2012), citing, <u>O'Leary v. Accretive Health, Inc.</u>, 657 F.3d 625, 630 (7th Cir. 2011). It may also be done by presenting a 'convincing mosaic of circumstantial evidence' that would permit the same inference without the employer's admission including suspicious timing, ambiguous statements oral or written and other bits and pieces from which an inference of retaliatory intent might be drawn such as evidence that the employer offered a pretextual reason for an adverse employment action. Id. citing, <u>Rhodes v. Illinois Dep't of Transportation</u>, 359 F.3d 498, 504 (7th Cir. 2004), <u>Silverman v. Board of Educ. of City of Chicago</u>, 637 F.3d 729, 734 (7th Cir. 2011), <u>Dickerson v. Board of Trustees of Community College Dist. No. 522</u>, 657 F.3d 595, 601 (7th Cir. 2011). With regard to suspicious timing, the causal link of a retaliation claim can and is frequently established by showing that there was a suspiciously short period of time between the employee's complaint and the adverse employment action. <u>Boumehdi v. Plastag Holdings, LLC</u>, 489 F.3d 781, 793 (7 Cir. 2007), citing, <u>Parkins v. Civil Constructors of Ill., Inc.</u>, 163 F.3d 1027, 1039 (7th Cir. 1998); see also <u>Maye v. Illinois Human Rights Comm'n</u>, 224 Ill. App. 3d 353, 362, 586 N.E.2d 550, 556 (1st. Dist. 1991) (3 month time period between filing and termination sufficient to establish retaliation).

The evidence in this case clearly presents a very "convincing mosaic of circumstantial evidence" supporting ISBELL's retaliation claims against JCI. First, it was only 19 days after

ISBELL filed her first EEOC charge on April 15, 2009 that JCI constructively denied ISBELL's

ADA accommodation request related to her Ehlers Danlos diagnosis.[36]  Also, around the time

ISBELL filed her April 15, 2009 charge, Cabellero was told by his supervisor, Walt Burdorf

("Burdorf") that ISBELL had requested she be assigned a different HR Generalist because she

felt communication between her and Caballero was ineffective.[37]  Caballero was never re-

assigned and continued to act as ISBELL's HR Generalist up to her termination.  In addition,

after Caballero learned of ISBELL's request for reassignment and that she filed a charge of

discrimination against JCI with the EEOC, Caballero forced ISBELL to engage in a rigorously

and unnecessary procedure to assess ISBELL's "accommodation" (unlike previously) by

requiring ISBELL submit numerous and redundant medical documentation to clarify her current

medical condition, and further threatened to revoke the temporary and arbitrary 9:15 a.m. start

time.[38]  In addition, whenever ISBELL complied with Caballero's demands for more medical

information, no JCI employee involved in review of ISBELL's medical documentation had any

medical background, and not one single JCI employee consulted with a medical provider or other

knowledgeable person regarding the medical documentation ISBELL provided to JCI.[39]

Despite the volumes of medical documentation, JCI arbitrarily insisted, contrary to the

mountain of professional medical opinions with specific diagnoses, that ISBELL's medical

documentation did not state a medical necessity for a 10:00 a.m. start time and further requested

ISBELL submit to an Independent Medical Examination ("IME") – an unprecedented

contradiction of Crane's own policy criteria regarding when an IME is required.  As if that

weren't enough, notwithstanding medical confirmation that ISBELL needed a 10:00 a.m. start

---

[36] See Dkt.#52, at ¶¶62, 66.
[37] See Dkt.#52, at ¶61
[38] See Dkt.#52, at ¶¶61, 64, 76, 78, 79.
[39] See Dkt.#52, at ¶¶53, 68, 73.

time to properly function, JCI assessed attendance penalty points against ISBELL during its alleged lay review of the medical documentation submitted by ISBELL's physicians and during the time between the IME and JCI's receipt of the IME report.[40]

Finally, only 6 weeks after ISBELL filed her second EEOC charge on July 14, 2009, JCI terminated ISBELL's employment.[41] Moreover, the termination was only 3 days after JCI received its own IME report confirming medical justification for a modified work schedule and the same day ISBELL provided JCI another doctor's note from Dr. Wahlstrom (the doctor referred by the IME) requesting JCI allow her flexibility with her start time until her medications could be properly adjusted.[42] This unrebuttable evidence leading up to and coinciding with the very short timing of ISBELL's termination is more than suspicious and most certainly establishes the required causal connection in accordance with the long standing case law; thus, JCI is not entitled to judgment as a matter of law on ISBELL's retaliation claims pursuant to Title VII and the IHRA.

### b.  *ISBELL has established JCI's conduct was pretextual.*

"A plaintiff can establish pretext either directly, with evidence suggesting that retaliation or discrimination was the most likely motive for the termination, or indirectly, by showing that the employer's proffered reason was not worthy of belief."  Sanchez v. Henderson, 188 F.3d 740, 746 (7th Cir. 1999), citing, Johnson v. Sullivan, 945 F.2d 976, 980 (7th Cir. 1991).  The indirect method requires a showing that "(1) the defendant's explanation has no basis in fact, or (2) the explanation was not the 'real reason', or (3) . . . the reason stated was insufficient to

---

[40] See Dkt.#52, at ¶¶79, 82, 83, 84, 89.
[41] See Dkt.#52, at ¶¶87, 97.
[42] See Dkt.#52, at ¶¶92, 93, 94.

warrant the [termination]." Id., citing, <u>Johnson v. City of Fort Wayne</u>, 91 F.3d 922, 931 (7th Cir. 1996).

Here, the unrebuttable evidence establishes that JCI's retaliatory conduct and subsequent termination were pretextual under both the indirect and direct methods of proof. The undisputed facts in this case evidence only one conclusion – JCI retaliated against ISBELL for asserting her statutory rights and then JCI used its attendance policy as pretext to cover up ISBELL's retaliatory discharge. The record is clear that JCI began to retaliate against ISBELL immediately after she filed the April 15, 2009 EEOC charge for violating the ADA and Title VII. First, JCI forced ISBELL to engage in a rigorous and superfluous procedure to assess her ADA accommodation request (unlike previously) and then questioned the legitimacy of the medical documentation submitted even though not one single JCI employee reviewing said medical documentation had any medical background or knowledge nor consulted any medical professional including ISBELL's own physicians regarding their responses. Then JCI had ISBELL submit to an IME (contrary to its own policy criteria for doing so) to determine whether her doctors were essentially telling the truth that ISBELL had a medical need for a flexible work schedule. Finally, JCI ignored its own IME's report confirming a credible psychological justification for ISBELL starting work later. At all times after ISBELL filed her EEOC charges, JCI continued to assess attendance penalty points against ISBELL even after JCI knew ISBELL had a credible psychological justification for a later start time. Not to mention that it was only 6 weeks after ISBELL filed her July 14, 2009 EEOC charge, only 3 days after JCI received the IME report, and the same day she provided JCI another doctor's note requesting JCI allow her flexibility with her start time until her medications could be properly adjusted that she was terminated for allegedly violating the attendance policy. JCI had ample medical evidence that

ISBELL could not comply with their arbitrary chosen start time of 9:15 a.m. until her medications were balanced. The record most clearly shows a pattern of certainty that JCI intentionally created a pretext for ISBELL's termination. Accordingly, JCI is not entitled to summary Judgment on ISBELL's Retaliation claims.

**C.      JCI Cannot Prove as a Matter of Law That it Did Not Discriminate Against ISBELL Based on Sex Under Title VII and/or IHRA.**

JCI makes the incorrect and unsupported assertion that the record is devoid of evidence of sex discrimination. To survive summary judgment under the direct or indirect method of proof, a plaintiff must create at least an inference of illegal discrimination. Greene v. Potter, 557 F.3d 765, 769 (7th Cir. 2009); see also Miller v. Borden, Inc., 168 F.3d 308, 312 (7th Cir. 1999) ("Under either method, summary judgment is improper if the plaintiff offers evidence from which an inference of discrimination may be drawn.")

*i.      Direct Method of Discrimination*

The Seventh Circuit has stated that "a plaintiff can prevail under the direct method" by "constructing a convincing mosaic of circumstantial evidence that allows a jury to infer intentional discrimination by the decision maker." Petts v. Rockledge Furniture, LLC, 534 F. 3d 715, 720 (7th Cir. 2008). The Courts recognized three different types of circumstantial evidence of intentional discrimination consisting of: (1) suspicious timing, ambiguous oral or written statements, behavior toward or comments directed at other employees in the protected group, and other bits and pieces from which an inference of discriminatory intent can be drawn; (2) evidence that similarly situated employees outside the protected class received systematically better treatment; or (3) evidence that the plaintiff was qualified for the job in question but passed over in favor of a person outside the protected class and that the employer's stated reason is a pretext for discrimination. Id. at 721.

Here, the record reflects that certain male employees were systematically treated better than ISBELL during the course of her employment. ISBELL was the only female employee supervised by Derby and at all relevant times Derby only supervised 3 full time employees, ISBELL, Ron Kleck ("Kleck") and Greg Siosin; only ISBELL and Kleck were engineers.[43] Derby admitted that when Kleck was out of work for 4-5 weeks pursuant to the Family Medical Leave Act, arrangements were made by JCI to outsource all of his job duties.[44] Further, like ISBELL's job duties, Kleck's job duties included internal customer service – the critical reason JCI claims allowing ISBELL to start at 10:00 a.m. would cause undue hardship.[45] At all relevant times, Kleck was the only Metallurgical Engineer employed by JCI; likewise, during all relevant times, ISBELL was the only Chemical Engineer employed by JCI.[46] It is compelling that Derby did not object to outsourcing all of Kleck's job duties to an independent laboratory, yet was "personally against" outsourcing some of ISBELL's job duties to allow ISBELL a 10:00 a.m. start time. Certainly an inference can be made that ISBELL was treated differently than male employees at JCI as a result of her sex.

In addition, the record reflects that JCI allowed certain male employees flexible work schedules or other schedule accommodations for various reasons yet denied ISBELL's medically supported ADA accommodation request. Specifically, Baseem Ranhal's was allowed to start work at 9:00 a.m., 30 minutes after the "mandatory" 8:30 a.m. start time implemented by Wasser, while ISBELL was required to start her work day at 8:30 a.m. (after JCI unilaterally revoked her previous accommodation).[47] And, another male employee, Robert Eicksteadt, was

---

[43] See RDSSOF, at ¶5.
[44] See RDSSOF, at ¶10.
[45] See RDSSOF, at ¶10.
[46] See RDSSOF, at ¶7.
[47] See RDSSOF, at ¶12.

allowed a reasonable accommodation in the form of working from home.[48]  In addition, ISBELL was often required to perform job duties outside of her job description and was never compensated for said extra duties.[49]  Finally, after ISBELL was terminated JCI hired various male employees to either fill her job position or take over her job duties.  The record reflects that John Hornick, Samuel Margolis and Fernando Gomez, all male employees, performed ISBELL's job duties after she was terminated.[50]  Clearly the evidence reflects that similarly situated male employees were treated differently than ISBELL.

ii.    *Indirect Method of Proof – McDonnell Douglas*

*Assuming arguendo*, this Court determines that ISBELL cannot prevail on her sex discrimination claims under the direct method, ISBELL has met her burden under the indirect method.  The Supreme Court created a structure for analyzing indirect method cases, commonly known as the McDonnell Douglas burden-shifting formula, which it first articulated in McDonnell Douglas Corp. v. Green, 411 U.S. 792 (1973), and later refined in Tex. Dep't of Cmty Affairs v. Burdine, 450 U.S. 248 (1981), and St. Mary's Honor Ctr. v. Hicks, 509 U.S. 502 (1993).  The analysis required is as follows: (1) the plaintiff must establish a prima facie case of discrimination; (2) the employer must then articulate, through admissible evidence, a  legitimate, nondiscriminatory reason for its actions; and (3) in order to prevail, the plaintiff must prove that the employer's stated reason is a pretext to hide discrimination.  McDonnell Douglas, 411 U. S. at 802-04.  To establish a prima facie case of sex discrimination, a plaintiff must show: "(1) she is a member of a protected class, (2) she met her employer's legitimate job expectations, (3) she suffered an adverse employment action, and (4) similarly situated employees outside of the

---

[48] See RDSSOF, at ¶13.
[49] See RDSSOF, at ¶4.
[50] See RDSSOF, at ¶17.

protected class received more favorable treatment." Everroad v. Scott Truck Sys., Inc., 604 F.3d 471, 477 (7th Cir. 2010).

a.    *Prima Facie Case*

JCI asserts that ISBELL cannot meet the second and fourth elements for establishing a prima facie case of sex discrimination.  As stated supra, the record is rife with sufficient evidence showing similarly situated male employees received more favorable treatment.  In addition, the record reflects that ISBELL did meet her employer's legitimate job expectations – Derby was pleased with her as an engineer and when she worked on a project she "did a good job."[51] Further, there is no evidence that ISBELL received any disciplinary actions or warnings for inadequate job performance.  In fact, the only warnings ISBELL received that related to her job at all were attendance point violations – all acquired after ISBELL filed her April 15, 2009 charge with the EEOC against JCI alleging, *inter alia*, sex discrimination – which clearly evidences pretext.

b.    *Pre-Text*

Any evidence that impeaches the employer's explanation may help show pretext.  Reeves v. Sanderson Plumbing Prods, Inc., 530 U.S. 133, 143 (2000).  JCI asserts that (1) it did not allow ISBELL her requested ADA accommodation because of undue hardship, and (2) JCI terminated ISBELL for violating the JCI attendance policy.  Both assertions are pretext – a red herring JCI facilitated to discriminate against ISBELL.  As established supra, JCI's proffered cause of undue hardship is unsupported, after-acquired and wholly inadequate to defeat pretext. JCI failed to accommodate ISBELL while it accommodated or allowed male employees to adjust their work schedules, and JCI outsourced Kleck's job duties during his medical leave while against doing the same for ISBELL – even though both ISBELL and Kleck had internal

---

[51] See Dkt.#52, at ¶10; see also Exhibit C to Dkt.#52 at pg. 63, lines 10-13

customer responsibilities and both were the only JCI employees with their respective job titles. Derby even admitted outsourcing was possible but that he was "personally against it" because it cost money; although, he was not against outsourcing for Kleck under a similar situation.

Although JCI terminated ISBELL for violating the attendance policy, the accumulation of those attendance point violations was the direct result of discrimination JCI forced upon ISBELL. JCI literally set ISBELL up for failure. JCI knew that if ISBELL was made to start work at 9:15 a.m., she would accumulate enough points under the attendance policy for termination; and JCI knew or should have known that fact when it revoked her previous accommodation of a 10:00 a.m. start time and thereafter refused to reinstate it – while allowing similarly situated male employees adjusted work schedules or later start times – all evidence of pretext.

It is obvious that ISBELL has provided sufficient facts to support of her prima facie claim that pretext exists under both the direct and indirect methods of proof dictated by the U.S. Supreme Court. In light of the foregoing, this Court must deny JCI summary judgment on the sex discrimination claims.

## CONCLUSION

For all the foregoing reasons, this Honorable Court should deny JCI's Motion for Summary Judgment in its entirety.

Respectfully submitted,
**ANNA B. ISBELL**

By:    __**/s/ Marissa B. Saltzman**_____
One of Her Attorneys

Spencer J. Marks, Esq. (1769928)
Marissa B. Saltzman, Esq. (6293683)
**POKORNY & MARKS, LLC**
6 West Hubbard, Suite 700
Chicago, Illinois 60654
(312) 540-0600