# IN THE UNITED STATES DISTRICT COURT
# FOR THE NORTHERN DISTRICT OF ILLINOIS
# EASTERN DIVISION

| | |
|---|---|
| ANNA B. ISBELL, | ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| v. | ) Case No. 11 C 2347 |
| | ) |
| JOHN CRANE, INC., | ) |
| | ) |
| Defendant. | ) |

## MEMORANDUM OPINION AND ORDER

Anna Isbell ("Isbell") brings this action against her former employer John Crane, Inc. ("Crane"), charging it with violations of state and federal law for actions that culminated in its August 26, 2009 termination of Isbell. More specifically, Isbell claims that Crane is liable under the Americans with Disabilities Act ("ADA," 42 U.S.C. § 12117(a)) and part of the Illinois Human Rights Act ("Illinois Act," 775 ILCS 5/101) for failing to accommodate her disability and also under Title VII of the Civil Rights Act of 1964 ("Title VII, 42 U.S.C. § 2000(e)) and another part of the Illinois Act (775 ILCS 5/2-102) for retaliating against her after she complained of that discrimination to the Equal Employment Opportunity Commission ("EEOC"). Isbell also charges Crane with sex discrimination under Title VII and still another provision of the Illinois Act (775 ILCS 5/1-101).

Each side has now brought a Fed. R. Civ. P. ("Rule") 56 cross-motion for summary judgment as to liability, with Crane seeking judgment on all claims and Isbell on all save those alleging sex discrimination.[1] Isbell has coupled her motion with a motion to strike Crane's

---

[1] Abbreviations "I" for "Isbell" and "C" for "Crane" are used in citations throughout this opinion. Thus Isbell's and Crane's memoranda in support of their respective motions for

(continued . . .)

LR 56.1 statement of facts that seeks to support Crane's summary judgment motion. For the reasons set out more fully below, Isbell's motion to strike is denied, while the parties' cross-motions for summary judgment are granted in part and denied in part.

**Motion To Strike Crane's LR 56.1 Statement of Material Facts**

Before this opinion proceeds to a recitation of the factual background of the case, it first needs to speak to Isbell's motion to strike Crane's LR 56.1 statement of facts due to a variety of alleged abuses. Crane's submission reflects its counsel's obvious misunderstanding of both the proper form and the function of such statements. LR 56.1 statements should be concise and include the facts that are both undisputed and material to the disposition of the case. By contrast, no one could seriously argue that C. St. ¶ 96, for example, is "short" or "concise": It is a six-page excerpt -- quoted in its entirety -- from Isbell's deposition testimony.

Indeed, Crane's entire statement is bloated with unnecessary facts and extensive quotations, frequently squeezing several distinct assertions into the same paragraph. To pick a representative example, C. St. ¶ 70 (record citations omitted) reads:

> In September 2008, Wasser asked Derby to provide a list of the start times for the employees in the materials laboratory. Derby responded to Wasser's email with a list of the actual start times (when an employee typically arrived as opposed to

---

(footnote continued)
summary judgment are cited "I. Mem. --" and "C. Mem. --". Responses to those memoranda use the abbreviation of the memorandum to which they respond preceded by "x R.," with the "x" denoting the author of the response. Isbell's and Crane's respective LR 56.1(a)(3) statements in support of their motions for summary judgment are cited "I. St. ¶ --" and "C. St. ¶ --." Isbell's additional statement of facts in opposition to Crane's motion for summary judgment is cited "I. Add. St. ¶ --". Responses to LR 56.1 statements similarly use the abbreviation of the statement to which they respond preceded by "x R.," with the "x" denoting the author of the response. When this opinion cites statements of fact, a citation to the response is omitted if the response simply admits the facts alleged. Finally, Isbell's "Motion To Strike Certain Facts Contained in Defendant John Crane, Inc.'s Local Rule 56.1 Statement of Undisputed Material Facts in Support of Its Motion for Summary Judgment" is cited "I. M. Strike ¶ --".

when they were supposed to arrive) and indicated that Isbell's typical work hours were 10:00 a.m. to 6:30 p.m. Sometime thereafter, Wasser informed Derby that he wanted the employees in the materials laboratory to work a uniform schedule from 8:30 a.m. to 5:00 p.m. Wasser changed the start time for employees in the materials laboratory to better align with customer needs. A number of internal customers had complained to Wasser about issues pertaining to the on-time delivery of Crane's products.

That contains multiple assertions of fact that, while related, should not have been grouped together under a single paragraph heading.

Such combinations obfuscate rather than clarify the individual facts, compelling the responding party to admit or deny only portions of any given paragraph and making it more difficult for this Court to identify the specific facts that are in dispute. Moreover, Crane's characterization of several of those assertions -- particularly by contrasting Isbell's start time with when she was "supposed to arrive" -- has inserted an unnecessary dispute into the otherwise uncontested fact that Wasser asked for and was provided with Isbell's schedule of 10 a.m. to 6:30 p.m.

Crane is also guilty of supplying numerous facts that are wholly irrelevant to its motion. Excessive quotations from Crane's employee handbook (C. St. ¶¶ 17-20) or other employees' job descriptions (C. St. ¶¶ 35-36) add nothing to the discussion. While not every fact provided in an LR 56.1 statement needs to be mentioned in the accompanying memorandum of law, the inclusion of many such facts -- evidently unimportant to disposition of the motion -- should at a minimum give counsel pause.

Crane's repeated attempts to advance its own factual and legal arguments with its LR 56.1 statement subvert the purpose of those statements, which is to assist the court in identifying whether any issues of material fact exist. While it is well within this Court's discretion to enforce LR 56.1 strictly (<u>Bordelon v. Chicago Sch. Reform Bd. of Trs.</u>, 233 F. 3d 524, 527 (7th

Cir. 2000) is typical of a host of cases so holding), to do so here would serve only to delay unnecessarily the ultimate disposition of the case.

In sum, what this Court said about motions to strike in Gittings v. Tredegar Corp., 2010 WL 4930998, at *1 n.4 (N.D. Ill. Nov. 29, 2010) is equally true here:

> Such motions are pretty much a waste of time and effort, because this Court is of course aware of the applicable rules and will not consider noncomplying materials.

Because it is possible -- albeit with significant difficulty -- to discern the disputed issues from Crane's filings, this Court declines to impose the harsh penalty of striking Crane's entire response and will instead proceed with its analysis of the evidence. What follows in the regrettably lengthy Facts section comes from statements that are undisputed by the parties.

**Facts**

Crane manufactures, sells and services engineered sealing systems for a wide range of industries (C. St. ¶ 1). Critical to Crane's business is its ability to ship products on a tight schedule because a significant portion of its clients -- particularly those in the oil and gas industry -- must suspend their operations while waiting for replacement parts from Crane (C. St. ¶¶ 39, 41). Completed parts typically arrive at Crane's lab by 7 a.m., but before they can be shipped they must undergo a series of inspections beginning with positive material identification ("PMI") testing (C. St. ¶ 40). Isbell and Crane dispute whether on-time delivery simply required completion of the PMIs in time for overnight shipping or whether those tests had to be completed as quickly as possible so that there would be time for additional inspections in the afternoon (C. St. ¶ 42; I. R. C. St. ¶ 42), but that dispute is not material (that is, outcome-determination) in light of the substantive rulings announced later in this opinion.

In April 2003 Crane hired Isbell to work in its Materials Laboratory as a chemical engineer, a position she held until her August 26, 2009 firing (I. St. ¶ 1). Among Isbell's various job duties were providing services for Crane's other departments ("internal customers") and conducting PMIs on Crane's products (C. St. ¶ 32).

In May 2005 Isbell began experiencing difficulty functioning in the early morning hours (I. St. ¶¶ 15-16). Upon examination she was diagnosed with Adult Attention Deficit Disorder ("ADD") and Bipolar Disorder and was prescribed a number of medications to treat them, none of which significantly improved her ability to function in the early morning because they did not kick in until several hours after she awoke (I. St. ¶¶ 15-17).[2] When Isbell was hired her regular hours were from 8:30 a.m. until 5 p.m. (C. St. ¶ 46), but in February 2006 she began to arrive at work somewhat later (I. St. ¶ 11). Brent Gross ("Gross"), her acting supervisor at the time, evidently made no objection when she started to come in later in the morning (C. St. ¶54).

In September 2006 James Derby ("Derby") was hired as a new laboratory manager and became the direct supervisor of three full time employees: Isbell, Ron Kleck ("Kleck") and Greg Siosin ("Siosin") (I. St. ¶ 20; I. Add. St. ¶ 5). Isbell asked Derby if she could continue to arrive at work at 10 a.m. -- as she had been doing at that point for about six months -- and he voiced no objection so long as she would complete her projects on time (I. St. ¶ 21; C. St. ¶ 62).

In June 2007 Derby asked Isbell for a note from her doctor to support her request for a later start time, and she accordingly provided him with a letter from Dr. Lakshmi Martin (C. St. ¶ 63) saying that "[s]he would greatly benefit from a flexible work schedule to accommodate her

---

[2] Isbell and Crane dispute exactly how long it should have taken for her prescriptions to take effect and also whether it would have been reasonable for Isbell to take them earlier in the morning (C. St. ¶¶ 59-61; I. R. C. St. ¶¶ 59-61). That dispute is not material for the same reason as stated at the end of the first paragraph in this Facts section.

- 5 -

challenge with focus & attention."  Isbell and Crane dispute whether her 10 a.m. starting time -- permitted by Derby until October 2008 -- was a mutually acceptable arrival time for Isbell's average work day, or whether instead it was merely an as-needed allowance (I. St. ¶ 21; C. St. ¶ 62).  But in any event it is not disputed that Isbell was allowed to start her workday by 10 a.m. without objection from Derby and without being held in violation of Crane's attendance policy (I. St. ¶ 21; C. St. ¶ 62).

In September 2008 James Wasser ("Wasser") took over the material science lab and became Derby's direct supervisor, requesting that Derby provide him with a list of the starting times for the employees in the lab (I. St. ¶¶ 26-27).  Derby complied, listing Isbell's typical work hours as 10 a.m. to 6:30 p.m., although he did not tell Wasser about Isbell's stated medical reason for her schedule (C. St. ¶ 70; I. St. ¶ 28).  Evidently prompted by Wasser's heightened emphasis on attendance, on October 7, 2008 Derby established uniform working hours of 8:30 a.m. until 5 p.m. for Isbell as well as the rest of the employees in her lab (C. St. ¶ 71).

In response to Isbell's objection to that change, Derby informed her that the new schedule was effective immediately and that her previous note from Dr. Martin would be referred to Jan Tuton ("Tuton"), Crane's administrator in charge of disability leave and accommodations (C. St. ¶¶ 7, 71).  Isbell promptly submitted forms to Tuton requesting a renewed medical accommodation ("first request") to start her workday at 10 a.m. (C. St. ¶ 72).  At Tuton's request Isbell also submitted a form from Dr. Deepak Kapoor, who had taken over for Dr. Martin as Isbell's treating physician in the fall of 2008 (C. St. ¶ 56).  That form answered whether it was necessary for Isbell to work less than a full schedule by stating "She needs to work night or evening shift as the meds make her drowsy during the day" (C. St. ¶ 72).  Tuton then asked Dr. Kapoor to elaborate in a followup questionnaire, to which Dr. Kapoor replied on December 8

that Isbell could not perform the essential functions of her job without a "later shift or starting late" and that a start time of "10 AM would be optimal" (C. St. ¶ 77).

Isbell was expected to start work at 8:30 a.m. while waiting for Crane to reach a decision about her request for a renewed accommodation, although she informed Tuton that was causing her performance to suffer (I. St. ¶¶ 34, 37, 54). During that time frame Isbell had trouble arriving on time under the newly changed schedule, prompting Antonio Cabellero ("Cabellero," part of Crane's human resources department) to remind her of her newly mandated start time and to emphasize the importance of her punctuality (C. St. ¶ 78). Although Crane's attendance policy allows for its employees to arrive up to 30 minutes late as a "grace period" provided that they make up that time in the same week (I. St. ¶ 11), it is unclear from the record whether Isbell was arriving after the grace period (when measured from the new 8:30 a.m. requirement) in late 2008.

On January 5, 2009 Cabellero officially responded to Isbell's request, informing her that they -- Cabellero, Derby, Wasser and Walter Burdorf ("Burdorf," Crane's human resources director) had decided to give her a 9:15 a.m. start time for 60 days, at which point the newly reduced accommodation would be revisited (C. St. ¶ 80). When Isbell inquired why she could not continue to have a start time of 10 a.m. -- which had effectively been allowed without objection for the 2-1/2 year period leading up to October 2008 -- Cabellero replied that one reason was that it would place an undue hardship on Crane (C. St. ¶ 81). Isbell tried to comply with her newly designated start time, but over the following months she had increasing difficulty in arriving at work on time in those terms (I. St. ¶ 56). Even with the benefit of the 30 minute grace period, for the first time Isbell began to accrue points for violating Crane's attendance policy when she arrived after 9:45 a.m., prompting Derby to speak to her about correcting her tardiness (C. St. ¶ 86).

In March 2009 Dr. Eric Gall diagnosed Isbell with a joint-affecting disorder ("Ehlers Danlos") for which she was prescribed medication (I. St. ¶ 58). Based on that diagnosis, Isbell again requested that she be permitted to start work at 10 a.m. as a renewed medical accommodation ("second request") (I. St. ¶ 59). Crane promptly requested that Dr. Gall fill out a medical questionnaire pertaining to Isbell's second request, to which he replied that the necessary accommodation would be to "[w]ork out a satisfactory (mutually) schedule if possible for her to complete her work" (C. St. ¶ 83). On May 4, 2009 Cabellero informed Isbell that her 9:15 start time -- still in force from her first request -- also served as a reasonable accommodation for her second request (I. St. ¶ 66). While the second request was pending Isbell continued to have difficulty arriving at work by 9:45 a.m., for which she continued to be assessed points for violating Crane's attendance policy (I. St. ¶ 70).

In early April 2009 Isbell asked for a new human resources generalist to be assigned to her because she was dissatisfied with her interactions with Cabellero, in particular that he had not followed up with her within 60 days of the decision on her first request (I. St. ¶ 61). After Burdorf refused to re-assign Cabellero, Isbell filed a charge against Crane with the EEOC, alleging discrimination based on her disability in violation of the ADA and based on her sex in violation of Title VII (I. St. ¶ 62). In June 2009, after meeting with Burdorf, Derby and Crane's counsel, Cabellero issued Crane's response to Isbell's first EEOC complaint (I. St. ¶¶ 74-75). Isbell filed a second EEOC complaint against Crane on July 14, 2009, charging disability discrimination pursuant to ADA and retaliation pursuant to Title VII (I. St. ¶ 87).

Meanwhile Crane repeatedly sought increasingly specific medical documentation of Isbell's disabilities as they pertained to her requests for renewed accommodations. To reevaluate Isbell's reduced 9:15 a.m. accommodation, Crane sent her a followup medical questionnaire for

her physician (I. St. ¶ 64). Dr. Kapoor responded on May 27, 2009 (C. St. ¶ 85), stating in pertinent part:

> Q. If you recommend a modified start time as an accommodation, please describe in detail the specific reasons why such a modified starting time is medically necessary?
>
> A. Her acceptable time on most days should be 10 AM as the medicines don't kick in for ADD & BiPolar.
>
> Q. Ms. Isbell has informed the Company that a modified starting time is necessary because she is required to take medications that cause her to be unable for work for about two hours. Is this an accurate representation? Will this be the case indefinitely? If not, for how long? Is there any medical reason why Ms. Isbell could not take the medications earlier in the day so that she could arrive at work at her department's normal starting time of 8:30 a.m.?
>
> A. [S]hould be reevaluated yearly appears to be permanent condition.

Crane then sent yet another questionnaire to Dr. Kapoor in June 2009, specifically asking him to clarify whether Isbell could take her medications earlier in the day in order to comply with an 8:30 a.m. starting time (C. St. ¶¶ 87-88), to which he replied:

> Due to her condition she has trouble waking up early so she can <u>not</u> take medication at earlier time.[3]

Still unsatisfied, in July 2009 Burdorf, Cabellero and Tuton asked Isbell to undergo an independent medical examination to verify whether there was a medical necessity for her delayed start time (I. St. ¶¶ 79-80). Isbell complied, undergoing an examination by Dr. David Hartman on August 4, 2009 (I. St. ¶¶ 85-88, 92-93), based upon which Dr. Hartman responded in pertinent part:

---

[3] Dr. Kapoor's emphasis on "<u>not</u>" (I. St. Ex. EE) was curiously omitted from Crane's submission quoting that language (C. St. ¶ 88).

- 9 -

> With better symptomatic control, Ms. Isbell should be able to begin work at the requested hour. At present, however, until her symptoms are under better control, I concur with Dr. Kapoor's statement that Ms. Isbell has credible psychological justification for starting work somewhat later.

Throughout those events Isbell repeatedly arrived at work after 9:45 a.m. and Crane continued to assess penalty points in accordance with its attendance policy (I. St. ¶¶ 70, 89, 95-96). Due to her accumulation of those points, Crane issued Isbell a written warning on May 4, 2009 and a final warning on June 18 of the same year (C. St. ¶94). Finally on the afternoon of August 26, 2009, upon Cabellero's and Derby's recommendation, Crane terminated Isbell for violating its attendance policy (I. St. ¶ 97).

In 2010 Isbell filed a third charge against Crane with the EEOC, asserting both (1) employment discrimination based upon sex and disability and (2) retaliatory discharge (I. St. ¶ 100). After exhausting her administrative remedies (Compl. Ex. A), Isbell filed this action.

**Summary Judgment Standards**

Every Rule 56 movant bears the burden of establishing the absence of any genuine issue of material fact (Celotex Corp. v. Catrett, 477 U.S. 317, 322–23 (1986)). For that purpose courts consider the evidentiary record in the light most favorable to nonmovants and draw all reasonable inferences in their favor (Lesch v. Crown Cork & Seal Co., 282 F. 3d 467, 471 (7th Cir. 2002)). Courts "may not make credibility determinations, weigh the evidence, or decide which inferences to draw from the facts" in resolving motions for summary judgment (Payne v. Pauley, 337 F. 3d 767, 770 (7th Cir. 2003)). But a nonmovant must produce more than "a mere scintilla of evidence" to support the position that a genuine issue of material fact exists, and "must come forward with specific facts demonstrating that there is a genuine issue for trial" (Wheeler v. Lawson, 539 F.3d 629, 634 (7th Cir. 2008)). Ultimately summary judgment is

warranted only if a reasonable jury could not return a verdict for the nonmovant (Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986)).

As with any summary judgment motion, this opinion accepts each nonmovant's version of any disputed facts, but only so long as it is supported by record evidence. Where as here cross-motions for summary judgment are involved, the principles of Rule 56 demand a dual perspective that this Court has sometimes described as Janus-like: As to each motion the nonmovant's version of any disputed facts must be credited, an arrangement that sometimes causes the denial of both motions.

### Disability Discrimination Claims -- Failure To Accommodate

Both Isbell and Crane have moved for summary judgment on Isbell's ADA and Illinois Act claims that Crane failed to accommodate her disabilities reasonably after her first and second requests. Illinois has adopted the federal framework for analyzing employment discrimination actions under the Illinois Act (Zaderaka v. Ill. Human Rights Comm'n, 131 Ill. 2d 172, 178-79, 545 N.E.2d 684, 687 (1989); see Teruggi v. Cit Group/Capital Fin., Inc., 709 F. 3d 654, 659 (7th Cir. 2013)). Under EEOC v. Sears, Roebuck & Co., 417 F. 3d 789, 797 (7th Cir. 2005), to establish a claim for failure to accommodate Isbell must show that (1) she is a qualified individual with a disability, (2) Crane was aware of her disability and (3) Crane failed to deal with her disability by a reasonable accommodation. Both parties agree that Isbell had a disability of which Crane was aware, but they dispute whether Crane's modified start time of 9:15 a.m. -- really 9:45 a.m. because of the grace period -- constituted a reasonable accommodation and whether Isbell was a "qualified" person with a disability.

It is important to understand that cases brought under the ADA present a meaningful -- and critical -- difference from those that invoke other federal anti-discrimination legislation: No

- 11 -

employer is obligated to make a special adjustment in an employee's working conditions because (for example) he or she is African-American or older or a woman, while by contrast the ADA requires the employer to provide a reasonable accommodation that will enable the "disabled" employee (that is, one who meets that statutory definition) to perform his or her job. Thus Congress has evinced special solicitude for the working person who must cope with a job despite his or her statutorily-described disability.

In addition to that across-the-board component of ADA litigation, this case poses an unusual -- perhaps unique -- circumstance. Before a change in management at Crane triggered the sequence of events narrated in the lengthy <u>Facts</u> section of this opinion, Crane <u>had already made</u> a reasonable accommodation to enable Isbell to do her job -- for some 2-1/2 years it had accommodated the later-starting work schedule that she had requested to meet her special needs for the performance of her job responsibilities. No real reason has been proffered by Crane as to why a new management broom, who (not incidentally) had no prior knowledge of Isbell's special arrangement or of the needs that had prompted it, should be entitled to start by subjecting her to a one-size-fits-all timing sweep. Indeed, as already indicated in the preceding paragraph, such uniformity of treatment is precisely what the underlying purpose of the ADA rejects.

Thus both parties really miss the mark by focusing their attention on the question of whether a start time of 9:15 a.m. was reasonable. Because Crane had already made a reasonable accommodation a few years earlier when it permitted Isbell to start her work day at 10 a.m., the question becomes instead whether it was reasonable for Crane to withdraw that existing accommodation. Without evidence that Isbell's later timetable was placing an undue burden on Crane, the answer to that question is plainly "no." Even if the record contained a material suggestion that her later start time was making it difficult for her to meet Crane's reasonable

expectations -- and it would be an undue stretch to draw such an inference from the record -- Crane's obligation under the ADA was to work with Isbell to adjust the existing accommodation in an attempt to correct those problems, not simply to alter the accommodation to her detriment.

At the risk of repetition (which this Court deems justified because counsel for the parties focused on the issue of reasonable accommodation from a different, and less relevant, perspective), it should again be remembered that Wasser made the decision to apply a uniform start time of 8:30 a.m., made applicable to other employees, to Isbell as well without any knowledge of the prior history or of her disability -- and that was so despite the fact that Isbell had already furnished other Crane people with documentation of her disability more than a year before. That being so, the ensuing half step backward to a 9:15 a.m. start time, as well as later demands for medical documentation months after receiving Isbell's requests, do nothing to cure Wasser's -- and hence Crane's -- unilateral retraction of Isbell's pre-existing reasonable accommodation.

To shift to another issue, Crane's argument that Isbell cannot avail herself of ADA protections because she is not a "qualified" person with a disability is also unpersuasive. For that purpose the "qualified" requirement calls for Isbell to be able to perform the essential functions of her job despite her disability, with or without an accommodation (42 U.S.C. §12111(8)). On that score Ammons v. Aramark Uniform Servs., Inc., 368 F. 3d 809, 818 (7th Cir. 2004) (internal brackets omitted) has reconfirmed several factors to be considered in determining whether a particular task is an essential function of a job:

> the employee's job description, the employer's opinion, the amount of time spent performing the function, the consequences for not requiring the individual to perform the duty, and past and current work experiences.

Crane contends that the time-sensitive nature of Isbell's duties -- particularly PMI testing of parts that needed to be delivered as soon as possible -- made her presence in the early morning essential, and that internal customers complained if Isbell did not finish her work on time. Though Isbell disputes the existence of such complaints,[4] and though this Court does not accept her version for purposes of the current cross-motions, Isbell makes the point that arriving before 10 a.m. was not critical to her job in light of the fact that she had performed her duties with that start time for over two years without serious issue. Though Derby, her boss, stated in his deposition that Isbell's work needed to be done as early as possible, Isbell's written job description does not specify any particular schedule -- and it will be recalled not only that there was no written record of any problems in that regard but also that she was never assessed any negative points on that account.

In short, Isbell and Crane do not truly dispute the adequacy of Isbell's job performance as such. So the issue is not really whether Isbell was qualified for purposes of the ADA, but rather whether retaining the pre-existing accommodation for her disability placed an undue burden on Crane. And because she had been successfully performing her duties with a start time of 10 a.m. for over two years, Crane has failed to create any material -- that is, outcome-determinative -- issue of fact as to that question.

Crane also attempts to call to its aid the en banc majority opinion in <u>EEOC v. Yellow Freight Sys., Inc.</u>, 253 F. 3d 943, 948-49 (7th Cir. 2001) as standing for the proposition that regular attendance is generally an essential job requirement and that employers need not

---

[4] While Derby has referred to complaints in a performance review that he had received from internal customers about Isbell's ability to get her work done on time, her personnel file is devoid of any such written complaints (C. St. ¶ 67; I. R. C. St. ¶ 67).

accommodate erratic or unreliable attendance. But such attempted reliance is misplaced because the issue here is not, as it was in that case, whether erratic and unexplained <u>absenteeism</u> on the part of a disabled employee must be tolerated, but rather whether it was essential for Isbell -- a totally reliable employee in terms of absenteeism -- to perform her duties in the early morning.

Nothing even resembling the <u>Yellow Freight</u> sort of nonperformance is implicated here. Crane has presented no evidence at all that it was unable to maintain its production schedule adequately when Isbell was starting her work day at 10 a.m., much less that any such delays might have been caused by Isbell's schedule. Crane's reliance on <u>Yellow Freight</u> is wholly misplaced.

Because the undisputed facts, even when construed in Crane's favor, demonstrate that Isbell could and did adequately perform her essential duties for over two years with the reasonable accommodation of a 10 a.m. start time, Crane's sudden replacement of that start time with a more onerous schedule without considering her known disability plainly constituted an unreasonable failure to continue to accommodate that disability under the ADA. Hence this Court grants Isbell's motion for summary judgment as to Counts I, II, VI and VII and denies Crane's cross-motion on those counts with prejudice.

**Retaliation Claims**

Under the burden-shifting framework announced in *McDonnell Douglas* Corp. v. Green, 411 U.S. 792 (1973), Isbell must first establish a prima facie case of retaliation by showing that: (1) she engaged in statutorily protected expression, (2) she suffered an adverse employment action and (3) there is a causal link between the protected expression and the adverse action (<u>Dickerson v. Bd. of Trs. of Cmty. Coll. Dist. No. 522</u>, 657 F. 3d 595, 601 (7th Cir. 2011)). Isbell's EEOC complaints and her subsequent termination following her accumulation of points

under Crane's attendance policy clearly satisfy the first two prongs,[5] leaving at issue only the alleged causal connection between the two.

Because Crane asserts that its actions were due to Isbell's frequent tardiness, Isbell bears the burden of showing that her violations of Crane's attendance policy were a mere pretext for Crane's adverse employment actions (Dickerson, 657 F. 3d at 602; Sanchez v. Henderson, 188 F. 3d 740, 746 (7th Cir. 1999)). More specifically, Isbell must prove that she would not have been terminated for her frequent tardiness had she not filed complaints with the EEOC (Univ. of Tex. Sw. Med. Ctr. v. Nassar, 133 S. Ct. 2517, 2528 (2013)).[6] Barring any direct admission of retaliatory intent from Crane to show that Isbell's attendance record was merely a pretext for termination, she must demonstrate (1) that Crane's explanation has no basis in fact or (2) that the explanation was not the "real reason" or (3) that the stated reason was insufficient to warrant her termination (Sanchez, 188 F. 3d at 746).

Isbell does not dispute that she violated Crane's attendance policy or that such infractions sufficed to warrant termination, arguing instead that her tardiness was not the real reason for Crane's actions. Here Isbell points out that Crane began taking adverse actions against her shortly after she filed her complaints with the EEOC, but suspicious timing alone is insufficient

---

[5] In the discussion that follows, this opinion's earlier determination that the application of that policy to Isbell was ADA-violative is irrelevant: Instead it is the fact and timing of that application that serve as the focus for analytical purposes.

[6] Because Isbell's EEOC complaints are the only protected activity on which she relies in her memoranda (I. Mem. 12-13; I. R. C. Mem. 17-19), this opinion's analysis will discuss only any allegations of retaliation that could arguably be causally related to those EEOC complaints. Accordingly Isbell's argument that a change of schedule can sometimes be considered an adverse employment action (I. Mem. 13-15) is inapposite because Crane made no changes to Isbell's schedule from the time of her first EEOC complaint to her date of termination.

to rebut an employer's proffered justification (Sanchez, 188 F. 3d at 747 n.4). Instead this Court must look to the facts when taken as a whole, which show that Crane made it clear to Isbell that it expected her to be at work by 9:45 a.m. and, after months of expressing its dissatisfaction with her whenever she arrived later, ultimately terminated her for violation of its attendance policy. What is more, Crane began assessing points to Isbell at least as early as March 2009, more than a full month before her first EEOC charge.

Isbell points to several other actions taken by Crane after she filed her charges, such as its requests for additional medical documentation from her and an independent medical examination. Those facts may create a genuine issue as to whether Crane took the proper steps to determine if it was reasonable for Crane to expect Isbell to arrive at work before 9:45 a.m., but that goes to her contention that Crane failed to accommodate her disability and not to her claim that she was terminated because of her EEOC complaints. Because it is undisputed that Isbell's supervisors at Crane actually did expect her to arrive by 9:45 a.m. -- regardless of whether that expectation was reasonable -- her frequent failure to meet that expectation would provide a legitimate non-pretextual reason for her termination. In short, Isbell's motion for summary judgment on her retaliation claims (Complaint Counts IV, V, IX and X) is denied and Crane's is granted.

## Sex Discrimination Claims

Isbell claims that Crane discriminated against her on the basis of sex by systematically treating male employees better during the course of her employment, specifically by permitting them flexible work schedules and other schedule accommodations (I. R. C. Mem. 22). Crane counters -- and this Court agrees -- that Isbell has not presented enough evidence to create a genuine issue of material fact as to her sex discrimination claims. As for Crane's cross-motion

for summary judgment, Isbell may defeat it either by adducing evidence that supports an inference of discrimination via the "direct method" (which may involve "either direct or circumstantial" evidence of discrimination (<u>Coleman v. Donahoe</u>, 667 F. 3d 835, 845 (7th Cir. 2012)) or by the "indirect method" that brings into play the burden-of-production-shifting approach first presented in <u>McDonnell Douglas</u> (<u>id</u>.).

Where as here there is no direct evidence of discriminatory intent (such as an unlikely admission by Crane), a plaintiff may nevertheless prevail under the direct method by using circumstantial evidence. As articulated in <u>Petts v. Rockledge Furniture LLC</u>, 534 F. 3d 715, 720-21 (7th Cir. 2008) (citations and internal quotation marks omitted):

> A plaintiff can prevail under the direct method by constructing a "convincing mosaic" of circumstantial evidence that allows a jury to infer intentional discrimination by the decisionmaker. However, the circumstantial evidence must point directly to a discriminatory reason for the employer's action. We have recognized three different types of circumstantial evidence of intentional discrimination. The first and most common consists of suspicious timing, ambiguous statements oral or written, behavior toward or comments directed at other employees in the protected group, and other bits and pieces from which an inference of discriminatory intent might be drawn. The second type is evidence that similarly situated employees outside the protected class received systematically better treatment. The third is evidence that the plaintiff was qualified for the job in question but passed over in favor of a person outside the protected class and that the employer's stated reason is a pretext for discrimination.

As stated at the outset of this section, the only type of circumstantial evidence sought to be relied on by Isbell is her assertion that Crane treated similarly situated males better by providing them with more scheduling flexibility (I. R. C. Mem. 22).

Among the individual men whom Isbell discusses, only Kleck was similarly situated to her. <u>Coleman</u>, 667 F. 3d at 847 (citations and internal quotation marks omitted) is informative on the issue of determining whether an employee is similarly situated to a plaintiff:

- 18 -

> In the usual case a plaintiff must at least show that the comparators (1) dealt with the same supervisor, (2) were subject to the same standards, and (3) engaged in similar conduct without such differentiating or mitigating circumstances as would distinguish their conduct or the employer's treatment of them. This is not a "magic formula," however, and the similarly-situated inquiry should not devolve into a mechanical, one-to-one mapping between employees.

True enough, both Isbell and Kleck were employed as engineers, and Kleck is the only male employee to whom Isbell compares herself who worked in the same lab or was also supervised by Derby. But even though Kleck's position was sufficiently similar to Isbell's to create the possibility of drawing a useful comparison, he never requested an accommodation from Crane that was analogous to Isbell's.

To that end Isbell points to Kleck's four or five week medical leave as evidence that he was treated more favorably than she was, but temporary medical leave is simply not comparable to Isbell's request for a permanent change to her daily work schedule. Instead of asking that Crane outsource her duties completely for a limited period of time, as Kleck had done when he requested medical leave, Isbell wanted Crane to accommodate her later arrival for several hours every morning on a long-term basis.

In short, there is nothing in the record to show that any similarly situated male Crane employee was treated differently from Isbell. And because she presents no other significant circumstantial evidence that "points directly to a discriminatory reason" for Crane's actions, Isbell cannot show sex discrimination by the direct method.

Isbell fares no better under the indirect method of proof. As explained in such cases as Everroad v. Scott Truck Sys., Inc., 604 F. 3d 471, 477 (7th Cir. 2010), to prove her claim under the McDonnell Douglas framework Isbell must first make out a prima facie claim by demonstrating that:

(1) she is a member of a protected class, (2) she met her employer's legitimate job expectations, (3) she suffered an adverse employment action, and (4) similarly situated employees outside of the protected class received more favorable treatment.

Because this Court's discussion of the direct method of proof has already addressed Isbell's inability to show that any similarly situated male employee received more favorable treatment, she cannot establish the fourth factor, and her attempt to show discrimination by the indirect method is also a non-starter.

Hence Crane's motion is granted as to Isbell's sex discrimination claims. That compels the dismissal of Complaint Counts III and VIII, and this Court so orders.

## Conclusion

For the above-stated reasons this Court denies Isbell's motion to strike Crane's LR 56.1 statement (Dkt. 62), while her motion for summary judgment as to liability (Dkt. 53) is granted as to Complaint Counts I, II, VI and VII and is denied as to Complaint Counts III, IV, V, VIII, IX and X. As for Crane's cross-motion for summary judgment (Dkt. 57), as to each of the Counts in the Complaint Isbell's success is mirrored by Crane's failure and Isbell's failure is mirrored by Crane's success. Finally, a status hearing is set for 8:45 a.m. April 4, 2014 to discuss the procedure and timing needed to quantify Isbell's recovery on her surviving counts.

_____
Milton I. Shadur
Senior United States District Judge

Date: March 21, 2014